STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. GLORIA JEAN JARBATH, DEFENDANT–RESPONDENT.

Argued September 27, 1988—Decided March 28, 1989.

*Anne C. Paskow,* Deputy Attorney General, argued the cause for appellant (*Cary Edwards,* Attorney General, attor-

ney, *Edward R. Bonanno,* Deputy Attorney General, of counsel and on the brief).

*Susan Green,* Assistant Deputy Public Defender, argued the cause for respondent (*Alfred A. Slocum,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

Defendant, Gloria Jarbath, is a mentally retarded twenty-one year old woman who has also been diagnosed as psychotic. She was charged with the knowing murder of her nineteen-day-old son. She pleaded guilty to a reduced charge of second-degree manslaughter. When she entered her guilty plea, defendant stated on the record that the baby had died after she twice accidentally dropped him on a coffee table. The prosecution did not contest this version of the offense. In accordance with the plea agreement, she was sentenced by the trial court to an indeterminate custodial term not to exceed seven years.

Defendant thereafter filed an appeal challenging her custodial sentence, claiming that the sentence was invalid and an abuse of discretion. She also presented information on appeal that indicated that she had been severely abused in prison; there were incidents of abuse of the defendant by other inmates that occurred almost daily, and in fact, a beating had taken place the day before sentencing while defendant was in custody. Further, she had attempted to commit suicide. The Appellate Division determined that this information required further development and consideration,[1] and relisted the matter, asking defense counsel to make two inquiries: (1) whether defendant

---

[1] One appellate judge stated that "on paper, it looks like there may be a lot of merit to what you say, that this is something the system did not cope with properly and imposed a term to an institution that really, in the circumstances is unwarranted, if there is availability of inpatient or outpatient care for her in the community which will be adequate to protect the public and do her some good."

was receiving proper treatment or care in prison; and (2) whether there was inpatient or outpatient care available in the community that would both "protect the public and do [defendant] good."

On rehearing, the Appellate Division inquired into the facts surrounding the offense itself in response to which the prosecutor presented another version by proffering evidence that the autopsy report showed the child had been beaten and had not died accidentally. The court was unable to resolve exactly what caused the child's death, but nevertheless decided to vacate the trial court's sentence as an abuse of discretion, finding that it would be a "serious injustice" to imprison defendant since imprisonment did not appear to function as a deterrent to Ms. Jarbath because of her retardation. The court concluded that as long as she was not a danger to the community and could get adequate care through placement in supervised educational, vocational, and recreational programs for the mentally retarded, prison was not the appropriate setting for her. Accordingly, the Appellate Division resentenced defendant as a third-degree offender with a five-year probationary term conditioned on: (1) receipt of psychiatric care; (2) participation in an Association of Retarded Citizens Program; (3) regular reporting to the Probation Department; (4) residence with family members; and (5) not living with any child under five years of age in the same house.

The State filed a petition for certification, which we granted. 110 *N.J.* 160 (1988). The question presented by the State's petition is whether the Appellate Division erred (1) in requesting the additional information concerning defendant's custodial treatment and experience, and (2) in resentencing defendant based on that information, although, as noted, the Appellate Division also considered the nature of the offense and defendant's mental condition in determining to impose a new sentence on the defendant. We thus address the broad question of the scope of the appellate court's power to review sentences, including specifically the scope of appellate original jurisdiction

when it is exercised in conjunction with its power to review sentences.

## I.

Our analysis must commence with *State v. Roth*, 95 *N.J.* 334 (1984). There the Court revisited the question of appellate courts' power of review of sentences in light of the "entirely new sentencing process" established by the New Jersey Code of Criminal Justice under *N.J.S.A.* 2C:1-1 to 98-4. *Id.* at 340. The Code set new limits on the discretionary power of sentencing courts by displacing standards established under prior decisional law and creating presumptive terms of imprisonment correlated to the severity of the crime itself. *Ibid.*

The goal of the Code was to establish uniformity by both structuring and standardizing the sentencing courts' discretion. The sentencing structure encompasses the gradation of crimes according to severity, expressed as a "degree." According to the degree of severity there is either a presumption of incarceration or a presumption of non-incarceration. The presumptive term of imprisonment is specified as a particular number of years, which can be increased or reduced within a maximum and minimum term of years. Standards—aggravating and mitigating factors—guide judicial discretion in determining the duration of custodial sentences within the range. These factors can also serve to obviate entirely a presumptive term of incarceration or, conversely, to overcome a presumption of non-incarceration and permit the imposition of a prison term. In addition, these factors are relevant with respect to other sentencing considerations, such as prescribing terms of parole ineligibility or downgrading the severity of the offense for sentencing purposes. *Id.* at 359.

The Court foresaw a central role to be played by appellate courts in effectuating this sentencing scheme and promoting uniformity and consistency. *Id.* at 361. The new approach envisages an important function for appellate courts in clarify-

ing relevant standards, promoting consistent interpretation of sentencing guidelines, and enhancing uniformity in the application of statutory standards to similar facts under similar circumstances. *Ibid.*

The *Roth* opinion set forth the structure and standards according to which an appellate court would perform this function. The critical focus of the appellate power to review and correct sentences is on whether the basic sentencing determination of the lower court was "clearly mistaken." This could occur (1) if the sentencing guidelines were not followed or applied; (2) if the aggravating and mitigating factors found by the sentencing court were not based on sufficient evidence in the record; and (3) if, even though the sentence falls within the guidelines on the basis of factors supported by adequate evidence, the application of the guidelines to the facts of the particular case renders the sentence clearly unreasonable so as to "shock the judicial conscience." *Id.* at 364–65. Thus, the appellate courts are expected to exercise a vigorous and close review for abuses of discretion by the trial courts. *Id.* at 364. At the same time, the appellate courts are adjured not to exercise their own sentencing discretion or to substitute their own judgment but to determine only whether or not the sentencing court was "clearly unreasonable." "What we seek by our review is not a difference in judgment, but only a judgment that reasonable people may not reasonably make on the basis of the evidence presented." *Id.* at 365.

In light of this structured approach to the appellate power to review sentences, the first step that must be taken by an appellate court is to examine whether the sentencing court followed and applied the correct sentencing guidelines. Here, the defendant was convicted of second-degree manslaughter under *N.J.S.A.* 2C:11–4, which calls for a presumptive term of seven years, with a minimum and maximum limit of five and ten years respectively. *N.J.S.A.* 2C:44–1f(c); *N.J.S.A.* 2C:43–6a(2). The trial court, however, chose yet another sentencing

option. It sentenced defendant to an indeterminate term not to exceed seven years, pursuant to the youthful-offender statute, *N.J.S.A.* 2C:43–5, which remains available as a sentencing alternative for eligible youthful offenders. *State v. Des Marets*, 92 *N.J.* 62, 75 (1983). When courts impose custodial sentences pursuant to the youthful-offender statute, they may not impose a term longer than five years unless there is "good cause shown," in which case the five-year maximum can be increased but in no event can it exceed the maximum term otherwise provided by law for the particular crime. *N.J.S.A.* 30:4–148. In this case, the court made a decision to extend the five-year maximum term, from which it may be inferred that it had determined there was "good cause" for such an extension. It may further be inferred that the trial court's determination that there existed "good cause" to justify the extension was based on a Code analysis involving the weighing of statutory aggravating and mitigating factors, since the court expressly referred to these factors. Because the Code's aggravating and mitigating factors are clearly probative of those elements that are most relevant to sentencing, we conclude that the court properly considered such factors in exercising its sentencing discretion under the youthful-offender statute. *See State v. Sainz*, 107 *N.J.* 283 (1987) (sentencing provisions of the Code prescribing the aggravating and mitigating factors are generally applicable to sentences imposed under Controlled Dangerous Substance Act, *N.J.S.A.* 24:21–1 to –20 (amended by *N.J.S.A.* 2C:35–1 to –23)). We thus find no mistaken exercise of discretion in the court's initial or basic approach to sentencing.

The succeeding inquiry is whether the trial court failed to adduce sufficient evidence to support its findings with respect to aggravating and mitigating factors or failed to exercise sound discretion relating to the weighing of aggravating and mitigating factors. The sentencing court in this case found the following aggravating factors "marginally applicable":

(1) the nature and circumstances of the offense and the role of the defendant therein, including whether or not the crime was committed in an especially heinous, cruel or depraved manner;

(2) the gravity and seriousness of harm inflicted to the victim, including whether the defendant knew or reasonably should have known the victim of the offense was particularly vulnerable and/or incapable of resisting due to her age; and

(3) the need to deter the defendant and others from violating the law.

These coincide with the factors enumerated under *N.J.S.A.* 2C:44–1a(1), (2), and (9).

The sentencing court found the following mitigating factors:

(1) the defendant probably did not contemplate that her conduct would cause or threaten serious harm or death;

(2) there were grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense and her mental deficiencies;

(3) the defendant has no prior history of criminal activity;

(4) the defendant's conduct was a result of circumstances unlikely to reoccur (sic); and

(5) the character and attitude of the defendant indicate that she is unlikely to commit other crime.

These parallel the factors prescribed by *N.J.S.A.* 2C:44–1b(2), (4), (7), (8), and (9).

The court, as indicated, sentenced defendant to a prison term of indeterminate duration with an increased maximum of seven years. It offered the following reasons for the sentence:

Considering the defendant's limited mental capacity and/or psychiatric disability or both, her young age of 20 years and considering the nature of the offense and all of the surrounding circumstances, as well as her clear prior criminal record, this indeterminate sentence not to exceed the presumptive term of seven years is appropriate and under the facts and under the law is required for purposes of punishment as a deterrent, for rehabilitation and so as not to deprecate the seriousness of the offense.

The Appellate Division disagreed with the trial court's determination and reasoning with respect to the existence as well as the balancing of aggravating and mitigating factors. The appellate court found that there was a "lack of any aggravating factors" and instead, the presence of "extreme mitigating factors." It then determined that these mitigating factors militated in favor of downgrading the offense and imposing a non-custodial term.

■ We concur in the conclusion of the Appellate Division that the trial court erred in its determination of the existence of aggravating factors. The trial court erroneously found that there was evidence sufficient to support the aggravating factor under *N.J.S.A.* 2C:44–1a(1) that the crime was "especially heinous, cruel, and depraved." This determination conflicts with the trial court's acceptance of Ms. Jarbath's version that she dropped the child accidentally. In addition, the trial court found a directly contradictory fact, which it expressed as a mitigating factor, that the defendant did not contemplate her conduct would cause serious harm. While the Appellate Division permitted the prosecutor to proffer an alternative version of the homicide, which suggested intentional rather than accidental conduct, it did not accept this proffer as part of the sentencing record nor did it give this version evidentiary consideration. There was thus no evidential support for the aggravating factor that the crime was "especially heinous, cruel or depraved." *N.J.S.A.* 2C:44–1a(1).

■ The sentencing court also listed the seriousness and gravity of harm as an aggravating factor. The death of the child is self-evident of the enormity of the harm. However, the death of the child itself was an element of the offense of second-degree manslaughter. *N.J.S.A.* 2C:11–4. Consequently, to determine that the fatal result of the accident constitutes grave harm independently sufficient to constitute the aggravating factor would in effect result in this evidence being counted twice, once in determining the degree of culpability of the crime and, again, as an aggravating factor. Such double-counting is unfair and not permitted. *State v. Gardner,* 113 *N.J.* 510, 519 (1989); *State v. Miller,* 108 *N.J.* 112, 122 (1987); *State v. Yarbough,* 100 *N.J.* 627, 633 (1985), *cert.* den., 475 *U.S.* 1014, 106 S.Ct. 1193, 89 *L.Ed.*2d 308 (1986); *State v. Reed,* 211 *N.J.Super.* 177, 188 (App.Div.1986) (specifically finding that victim's death cannot be double-counted as an aggravating factor in an aggravated manslaughter case). The harm to the

victim in this case cannot be included as an aggravating factor under *N.J.S.A.* 2C:44–1a(2).

Finally, the sentencing court found that the need to deter the defendant and others was an additional aggravating factor under *N.J.S.A.* 2C:44–1a(9). The Appellate Division determined, however, that defendant's impaired mental state coupled with the unintentional aspects of the crime negated the finding that a sentence could serve as a personal or specific deterrent for the defendant. It found from the record that defendant's retardation prevented her from "really understand[ing] at all what she did wrong, or how it happened, or how she's into this state where she can't understand the world around her." This evidence is not disputed. The question then is whether, if the need for specific deterrence was not supported by the evidence, there was evidence of the need to deter others, general deterrence, sufficient to constitute this aggravating factor.

Personal and general deterrence are interrelated but distinguishable concepts; a sentence can have a general deterrent effect on the public in addition to its personal deterrent effect on the defendant. *See State in the Interest of C.A.H. & B.A.R.*, 89 *N.J.* 326, 334–35 (1982). Nevertheless, the absence of any personal deterrent effect greatly undermines the efficacy of a sentence as a general deterrent. We have recognized recently that general deterrence unrelated to specific deterrence has relatively insignificant penal value. *See State v. Gardner, supra*, 113 *N.J.* at 520.

It is difficult to conclude that under the circumstances, the imprisonment of defendant will serve any need of general deterrence. The underlying offense involved the accidental killing of a baby. We can understand that parental conduct, even though unintentional, whereby a baby is *twice* accidentally dropped, should be dealt with severely so that others responsible for the care of helpless infants will be mindful of the penal consequences of criminally neglectful conduct. Persons with

parental or child-care responsibilities or control over children would be deterred by the realization that the commission of such a crime warrants imprisonment. This conclusion, however, is weakened when the offender, whose punishment is designed to serve as an example to others, acted not only unintentionally, but was sufficiently emotionally impaired and mentally retarded that she could not comprehend the "wrongfulness" of her conduct. Thus, we would conclude in these circumstances that general deterrence as an aggravating factor was not supported by sufficient evidence.

It is clear that an error in the sentencing court's determination concerning the existence of any aggravating factors nullifies the weight accorded to such factors and materially alters the calculus in the ensuing balancing of aggravating and mitigating factors. Here, because the sentence of the trial court was based on a determination of the existence of particular aggravating factors for which evidence was lacking, the sentencing formula for weighing the aggravating and mitigating factors was derivatively impugned. Thus, even though the trial court believed that the defendant could appropriately be given the comparatively more lenient mode of incarceration available to eligible youthful offenders than the Code-dictated state prison terms applicable to older offenders, its basic determination was flawed. The Appellate Division correctly concluded that the prison sentence imposed by the trial court on defendant was invalid and should be set aside.

The Appellate Division also determined that the sentence imposed constituted a "serious injustice" that overrides any need for general deterrence contrary to *N.J.S.A.* 2C:44–1d. Conceptually, this determination is very close to, perhaps indistinguishable from, the determination that "extreme mitigating factors" outweigh any aggravating factors. However, the standard for invalidating sentences because of a "serious injustice" is extremely narrow: it should be applied only under circumstances that are "truly extraordinary and unanticipated."

*State v. Roth, supra,* 95 *N.J.* at 358.[2] This Court has rarely found such "extraordinary and unanticipated" sentences. *Id.* at 358.

The criterion of "serious injustice" necessarily directs attention to the character of the defendant. The *Roth* opinion stressed that "the overall thrust of the new Code" was its "focus upon the gravity of the offense and not the blameworthiness of the offender." *Id.* at 355. However, *Roth* noted that courts have a "residuum of power" to consider the "character and condition" of the defendant under *N.J.S.A.* 2C:44–1d, and can reject the presumption of imprisonment for first- or second-degree offenses if "having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others." *Ibid.*

It is, nevertheless, clear under the Code that rehabilitation is not the goal to be achieved by a consideration of the character and condition of the offender. *Id.* at 367. Consistent with and illustrative of the sentencing philosophy of the Code, *Roth* itself rejected any leniency for a first-time sexual offender who claimed to have been influenced by his drug and alcohol addiction: "It is unfortunate, but not exceptional.... Many crimes arise out of drug and alcohol use. His situation, while regrettable, is not rare." *Id.* at 368. Thus, *Roth* removed judicial leeway to focus on the character and condition of the defendant in modifying sentences in order to enhance a defendant's prospects for rehabilitation. *Cf. State v. Leggeadrini,* 75 *N.J.* 150 (1977) (pre-*Roth* decision in which

---

[2]The Court has not readily found such "serious injustice." *See, e.g., State v. Kelly,* 97 *N.J.* 178, 220 (1984) (five-year sentence for battered woman who killed husband not excessive—defendant not "truly extraordinary"); *State v. Dunbar,* 108 *N.J.* 80, 97–98 (1987) (even if seven-year parole-ineligibility sentence of twenty-two year old convicted of second-degree robbery is "harsh," no clear error of judgment); *State v. Kent,* 212 *N.J.Super.* 635, 643 (App.Div.1986) (availability or even success of drug-rehabilitation program not sufficent basis to conclude imprisonment of child-sexual-abuse offender is "serious injustice").

totality of factors led to conclusion that sentence was manifestly excessive for crime not likely to recur and therefore rehabilitation not necessary); *and State v. Kent, supra,* 212 *N.J.Super.* 635 (post-*Roth* decision holding availability or even success of rehabilitation program not sufficient basis to conclude sentence was excessive).

Rather, the purpose in permitting consideration of the character and condition of the defendant under the Code would be to avoid the imposition of a sentence that goes beyond the central Code purpose of imposing proportionate sentences, that is, sentences that fit the particular crime. A disproportionate sentence would be identified by a term of imprisonment that creates a "serious injustice" that overrides the needs of general deterrence. This statutory benchmark demarks the point beyond which an otherwise proper sentence exceeds its appropriate penal objective of proportionate punishment. *Cf. State v. Ghertler,* 114 *N.J.* 383, 393 (1989) (severe sentence of youthful offender does not "shock the judicial conscience" when the offender has lengthy juvenile and adult criminal records).

It is, nevertheless, the rare case where imprisonment for serious crimes will not further the goals of general deterrence. For example, there may be instances where the character and condition of the defendant are so idiosyncratic that incarceration or extended imprisonment for the purposes of general deterrence is not warranted. *See, e.g., State v. Gardner, supra,* 113 *N.J.* at 520; *State v. Leggeadrini, supra,* 75 *N.J.* at 158; *State v. Ivan,* 33 *N.J.* 197, 202 (1960). This case conforms to these examples.

Defendant's deficient mental and emotional condition were relevant not only to her culpability but also to her capacity to assimilate punishment. Both courts found that the crime was unintentional. There was little evidence to suggest that defendant could comprehend that she had committed a crime that deserved a prison term, or that she could modify her

behavior based on her imprisonment. In addition, defendant did not have the understanding or emotional strength of relatively normal persons. She apparently could not endure life in prison without unusual suffering, that is, hardship and privation greatly exceeding that which would be accepted and endured by ordinary inmates as the inevitable consequences of punishment. In sum, as determined by the Appellate Division, the "serious injustice" of imprisonment under these circumstances clearly outweighs the needs of general deterrence.

## II.

Much of the evidence to support this conclusion was adduced at the appellate level. · The State argues that the Appellate Division lacked the authority to request the additional information concerning the defendant's "post-sentencing mental state," and that the court improperly considered that information in vacating the original sentence. In considering this issue, we note that the Appellate Division's request was limited to (1) whether defendant was receiving treatment at Clinton, and (2) whether inpatient or outpatient care was available in the community. The State's petition therefore is not entirely accurate when it describes the requested information as pertaining to defendant's "post-sentencing mental state." Nevertheless, as we view the record, the Appellate Division purported to exercise its original jurisdiction both to supplement as well as to clarify the record. We conclude that under the circumstances, this exercise of original jurisdiction was well within the court's constitutional powers and wholly consistent with the legislative policy as reflected in the Code.

Original appellate jurisdiction was conferred on appellate courts in New Jersey by the 1947 Constitution, Article 6, section 5, paragraph 3. *See* Schnitzer, "Civil Practice and Procedure," 9 *Rutgers L.Rev.* 307, 324 (1954). The power to review legal but excessive sentences was recognized explicitly by the Court in 1964 in the case of *State v. Johnson*, 42 *N.J.*

146, 158–59 (1964). It was found to stem directly from the Constitution. *Id.* at 158; *see also State v. Laws,* 51 *N.J.* 494, 510 (1968) (applying appellate power to modify sentencing decisions to jury determinations). Thereafter, appellate power to modify sentences was firmly established. *State v. Kunz,* 55 *N.J.* 128, 141 (1969); *State v. Bess,* 53 *N.J.* 10, 18 (1968). However, this power was to be used only sparingly: when trial courts are "clearly mistaken" and "the interests of justice demand intervention and correction." *State v. Johnson, supra,* 42 *N.J.* at 162.[3]

There is no question that since *State v. Johnson,* when an appellate court finds a clear abuse of discretion, it has the power to make new fact-findings. *Id.* at 157; *see State v. Yough,* 49 *N.J.* 587, 596 (1967); *State v. Adams,* 125 *N.J.Super.* 587, 597 (App.Div.1973). The power to review the evidence and reach independent determinations of the facts encompasses the power to call for additional evidence to supplement the record. *See R.* 2:5–5(a), *R.* 2:10–5.

Pursuant to *Roth,* an appellate court could, under the Code, use its original jurisdiction in conjunction with its review jurisdiction over sentences to examine whether the aggravating and mitigating factors are based on sufficient evidence. Further, even if the sentence was within the established guidelines and based on sufficient evidence, it could invoke such jurisdiction to decide whether a sentence "shocked the judicial conscience." The exercise of such jurisdiction could involve new fact-finding to be effectuated by reviewing the existing record or by supplementing the sentencing record either at the trial level through a limited remand or at the appellate level. Never-

---

[3] A 1986 update to the ABA's Standards on Appellate Review of Sentences took note of legislative trends to narrow the discretion of sentencing judges (Ch. 20), and found appellate review was consistent with those changes. *Ibid.* According to the ABA report, appellate oversight of applicable legal norms is necessary. *Ibid.* Further, the supplement noted that "despite the movement toward more determinate sentencing, large questions are still subject to broad discretion." *Id.* at Ch. 20, 4S.

theless, the exercise of appellate original jurisdiction over sentencing should not occur regularly or routinely; in the face of deficient sentences, a remand to the trial court for resentencing is strongly to be preferred.

There are, however, situations in which such a remand is contraindicated. In the present case, exigencies relating to the welfare of the defendant justified retention of original sentencing power by the appellate court. By the time the Appellate Division took action, defendant had already spent 132 days in prison. It had become evident that prison was not having its expected or intended penal effect. Thus, although original jurisdiction should be used frugally, it can promote the proper administration of criminal justice when it is exercised under exigent circumstances to rectify an injustice. It was soundly invoked in this case.

The exercise of original jurisdiction to impose a correct sentence in these circumstances is to be distinguished from the exercise of jurisdiction under *Rule* 3:21–10(b) to review the post-conviction effects on an imprisoned defendant's physical or mental health. Under *Rule* 3:21–10(b), courts may amend a custodial sentence to permit the release of a defendant because of the defendant's illness or infirmity. In *State v. Tumminello*, 70 *N.J.* 187 (1976), this Court reviewed a defendant's continued confinement where health problems threatened the loss of one or both of defendant's legs. Because of the rapid deterioration in defendant's condition, the Court exercised its original jurisdiction to arrive at an expedited determination. *Id.* at 192–93. This power, however, may not be used to reduce or change sentences, but only to release prisoners. *State v. Priester*, 99 *N.J.* 123 (1984). It also may not be used unless the problem shows changed circumstances in a defendant's health that have occurred since the time of the original sentence or there exists information about the defendant's health previously unknown to the sentencing court. *Id.* at 136. This power, therefore, is not used to challenge the original sentence but is reserved only for post-sentence circumstances. Moreover, this

power ordinarily does not implicate the original jurisdiction of an appellate court. It is usually exercised by the trial-level sentencing court on a proper motion brought by an aggrieved defendant.

In this case, it is clear that the power codified under *Rule* 3:21–10(b) was not invoked. Although the Appellate Division here considered post-sentence circumstances, these were not addressed for the sole purpose of securing the release of the defendant from prison. Rather, these circumstances were used in conjunction with the evidence otherwise indicating that the original sentence was improvident and that in their totality, the facts required the invalidation and modification of the sentence originally imposed.

In sum, the power of original jurisdiction enables an appellate court to engage in a *de novo* review of the record as well as to supplement the record either through a remand to the trial court to adduce additional evidence or through a presentation of evidence on appeal.[4] However, this power should be used only sparingly. Here, the Appellate Division was well within its power to exercise original jurisdiction directly and promptly, given the strong evidentiary indications of an incorrect sentence constituting a serious injustice, and exigencies relating to the inability of defendant to understand or endure her imprisonment.

---

[4]The appellate review of sentences does not represent as serious an encroachment on the sentencing court's powers as do other forms of "substituted judgment." Sentencing procedures rely largely on a "paper record" (Sentencing Manual for Judges, p. 69 (September 1988); *see N.J.S.A.* 2C:44–6b), which the appellate courts are as equipped to evaluate as the sentencing court. Further, in sentencing, judges may consider material otherwise inadmissible under conventional evidentiary standards, such as much of the information contained in pre-sentence investigation reports. (*See Sentencing Manual, supra* at 69). They may review the arrest record, polygraph reports, investigative reports, juvenile adjudications, and unlawfully-seized evidence. (*Id.* at 69–73.) Therefore, as the record is more relaxed, exercise of appellate court original jurisdiction in reviewing and supplementing the record does less violence to the procedural protections otherwise structured into the trial process.

### III.

The final issue in this case is whether the sentence imposed by the Appellate Division is valid. As noted, the Appellate Division resentenced defendant as a third-degree offender with a five-year probationary term conditioned on (1) receipt of psychiatric care; (2) participation in an Association of Retarded Citizens Program; (3) regular reporting to the Probation Department; (4) residence with family members; and (5) not living with any child under five years of age in the same house.

We are constrained to note preliminarily the question of the propriety of the downgrading of the offense, although this was not raised by the State. Although defendant pleaded guilty to a second-degree crime, the Appellate Division resentenced her as a third-degree offender, and then apparently applied the presumption against imprisonment applicable to third-degree offenders. Under the Code, it is permissible to sentence a defendant to a term appropriate to a crime of one degree lower than that of the crime for which she was convicted, "where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors." *N.J. S.A.* 2C:44–1f(2). However, although the court may downgrade the sentence, it may not downgrade the offense in order to apply a presumption against imprisonment. *State v. O'Connor*, 105 *N.J.* 399, 404–05 (1987); *State v. Rodriguez*, 179 *N.J.Super.* 129, 134 (App.Div.1981). "[T]he applicable presumption is to be determined not by the sentence imposed but by the offense for which a defendant is convicted." *State v. O'Connor, supra*, 105 *N.J.* at 404–05. Therefore, the Appellate Division's decision to downgrade the offense in order to apply the presumption against imprisonment was incorrect and must be modified. Nevertheless, the record supports the conclusion that although defendant was properly convicted as a second-degree offender, the presumption of imprisonment applicable to this offense was clearly overcome.

The State contends that the Appellate Division's sentence is invalid because it is not supported by a statement of reasons. *Rule* 3:21–4(e) provides that "[a]t the time the sentence is imposed the judge shall state his reasons for imposing such sentence ... and the factual basis supporting his finding of particular aggravating or mitigating factors affecting sentence." The State asserts that *Rule* 3:21–4(e) applies to the Appellate Division as well as to the Law Division, and that the former is therefore required to provide an explicit statement of the reasons supporting the sentence. The only reference to the reasons for the sentence by the appellate court in this case, the State argues, was a cursory indication that "it would be a serious injustice to imprison [Jarbath]; that in fact, because of the extreme mitigating factors that are involved, and the lack of any aggravating factors, ... she should be sentenced as a third degree offender to a period of probation for five years."

We conclude that the Appellate Division must state on the record its reasons for the sentence that it imposes. *See State v. Whitaker,* 79 *N.J.* 503, 512 (1979) (the appellate court must set forth its reasons for disturbing a trial court sentence). When the Appellate Division determines to exercise original jurisdiction to supplement the sentencing record, either directly or by a limited remand, and, further, to impose sentence directly, it must set forth its reasons both for the exercise of original jurisdiction and for the sentence actually imposed. Here, while the Appellate Division did not purport to explain why it decided to exercise original jurisdiction or explain fully the basis of its sentence, its reasons are apparent from its determination.

It is clear from the record that the Appellate Division concluded that the mitigating factors were "extreme" and that no aggravating factors applied. From a fair reading of the transcript, it appears that the court found several mitigating factors. It is readily deducible that the appellate panel fully agreed with the trial court concerning essential mitigating factors, *i.e., N.J.S.A.* 2C:44–1b(4); *N.J.S.A.* 2C:44–1b(7); and *N.J.S.A.* 2C:44–1b(8). The Appellate Division obviously felt

that the defendant would be particularly likely to respond to conditional probationary treatment, *N.J.S.A.* 2C:44–1b(10). It further concluded that imprisonment entailed an excessive hardship to the defendant, *N.J.S.A.* 2C:44–1b(11), contributing to a determination that the sentence constituted a serious injustice without redeeming deterrent effects under *N.J.S.A.* 2C:44–1d.

The trial court's findings of substantial mitigating factors regarding the unlikelihood of Ms. Jarbath's committing any violent acts in the future strongly support the appellate court's sentencing determination. The record discloses that when defendant is placed in inappropriate environments, she finds it impossible to cope emotionally, and has even had breaks with reality. A medical doctor indicated that a person with the degree of mental retardation of the defendant would fare better "in special habilitation programs" and a managed environment. There was evidence that the defendant could hold a job and dress, sew, and cook for herself. The conditions of probation determined by the Appellate Division called for placement of defendant in a special habilitation program for the mentally retarded that would include educational, vocational, and recreational activities.

We are satisfied that the record and transcript in this case sufficiently reveal the basis for the Appellate Division's determination. That court clearly decided to follow and apply Code sentencing standards; it properly determined aggravating and mitigating factors and undertook to balance these factors. Its statement of reasons considered against the backdrop of the entire record can in this case be accepted as a sufficient explanation of the evidence relied on and the statutory standards followed for the sentence finally imposed.

## IV.

In conclusion, the Appellate Division appropriately exercised its power of original sentencing jurisdiction. Although the trial court sought to impose a more lenient prison term on defendant

as a youthful offender, the Appellate Division properly critiqued the lower court's reasoning in support of any prison term. It correctly rejected the trial court's findings of aggravating factors and its resultant weighing of aggravating and mitigating factors. The Appellate Division soundly applied statutory criteria when it vacated the sentence as a serious injustice without sufficient corresponding deterrent effect. Moreover, the sentencing situation affecting the welfare of the defendant was exigent. Further, it then applied correct sentencing standards to the available evidence in determining a new sentence. Under these circumstances, the Appellate Division's power to review and vacate the sentence justified the exercise of original jurisdiction in reviewing the facts *de novo*, supplementing the record, vacating the original sentence and imposing a non-custodial sentence.

Accordingly, this Court modifies the judgment below to reflect defendant's conviction of a second-degree offense. The judgment as modified is affirmed.

*For Affirmance and modification* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.