633 A.2d 521

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. SEAN STYKER, DEFENDANT-APPELLANT.

Argued September 27, 1993—Decided December 7, 1993.

*Matthew R. Schutz,* Designated Counsel, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney).

*Arthur S. Safir,* Deputy Attorney General, argued the cause for respondent (*Fred DeVesa,* Acting Attorney General, attorney).

PER CURIAM.

The judgment is affirmed, substantially for the reasons expressed in the opinion of the Appellate Division, reported at 262 *N.J.Super.* 7, 619 *A.*2d 1016 (1993).

WILENTZ, C.J., concurring.

I concur in the Court's affirmance of the judgment below. I write to underline an inconsistency between the sentencing option available for "youthful" first- and second-degree offenders—sentencing under the young adult offenders statute, *N.J.S.A.* 2C:43–5, which can result in an indeterminate term served at the Youth Correctional Institution Complex ("Youth Complex")—and the sentencing mandated for other adults (twenty-six and older) for the same crimes, sentencing that will result, practically without exception, in prison terms in the range of five to ten years for second-degree offenders and ten to twenty years for first-degree offenders. Given the infrequency of youthful offender sentences,[1] this sentencing disparity presumably has little effect on deterrent goals. Its potential for diluting deterrence exists, however, and the Legislature should be made aware of it.

The young adult offenders statute makes available, without exception, to all offenders between the ages of eighteen and twenty-five, at the court's option, an indeterminate sentence for their offense, presumably including first- and second-degree offenses. *N.J.S.A.* 2C:43–5. Were the offender twenty-six years of age or older, that same first-degree offense, under our decisions, almost mandatorily results in a prison term of between ten to

---

[1] According to data from the judiciary's sentencing database, in 1991, of the 4,043 defendants convicted of first- or second-degree offenses, only 136 were sentenced to indeterminate terms at the Youth Complex. Similarly, of the 4,063 defendants convicted in 1990 of first- or second-degree offenses, only 182 were sentenced to the Youth Complex.

twenty years. Given a presumptive sentence of fifteen years in prison and assuming no parole ineligibility, serving at least three years of real time is almost a certainty.

The decision to sentence a young adult offender to the Youth Complex is subject to the discretion of the sentencing court. *State v. Nunez*, 209 *N.J.Super.* 127, 134, 506 *A*.2d 1295 (App.Div. 1986) (construing *N.J.S.A.* 2C:43–5). The courts of this State have not yet fleshed out the factors that should guide that discretion, but under *N.J.S.A.* 2C:43–5's predecessors,[2] that decision usually involved balancing the potential for rehabilitation against the need for the secure confinement of the defendant and general deterrence. *State v. McBride*, 66 *N.J.* 577, 580, 334 *A*.2d 27 (1975) (suggesting that goal of rehabilitation should guide sentencing of youthful offenders); *State v. Provet*, 133 *N.J.Super.* 432, 439, 337 *A*.2d 374 (App.Div.1975) (affirming decision to sentence twenty-three-year-old defendant convicted of rape and armed robbery to fixed term at state prison rather than indeterminate term at Youth Complex because judge considered defendant "dangerous and capable of repeating this type of offense unless incarcerated"); *see also* Model Penal Code § 6.05 (1962) (providing for indeterminate term sentencing for offenders between ages of sixteen and twenty-one "if the [c]ourt is of the opinion that such special term

---

[2] The language of *N.J.S.A.* 2C:43–5 is substantially similar to, and was largely based on, prior New Jersey statutes providing an indeterminate term sentencing option for youthful offenders. *State v. Des Marets*, 92 *N.J.* 62, 88, 455 *A*.2d 1074 (1983) (Handler, J., concurring in part and dissenting in part); New Jersey Criminal Law Revision, *The New Jersey Penal Code, Volume II: Commentary* 361 (1971). Therefore, notwithstanding the Court's decision today that the *McBride* preference did not survive enactment of the Code, cases construing the predecessor statutes may be helpful in interpreting the current law. ·

I do not believe the Court's decision today alters the factors relied on in deciding whether to sentence under the young adult offender statute. While we have concluded in the past that the guidelines in the Code of Criminal Justice reflect a general shift toward a retributive rationale for sentencing, *e.g., State v. Ramseur*, 106 *N.J.* 123, 178, 524 *A*.2d 188 (1987), the Legislature's retention of a young adult offender sentencing option demonstrates a continued belief in the potential for rehabilitation of first-time, young adult offenders. *Des Marets, supra,* 92 *N.J.* at 70, 455 *A*.2d 1074.

is adequate for his correction and rehabilitation and will not jeopardize the protection of the public").[3]

Comparing the sentencing scheme prescribed by statute and by regulation, whether a defendant is sentenced to state prison or to the Youth Complex is significant with respect to eligibility for parole. If a defendant is sentenced to prison other than for a life term, and the court does not impose a parole bar, the defendant will be presumptively eligible for parole after serving one-third of the sentence.[4] *N.J.S.A.* 30:4–123.51; *N.J.A.C.* 10A:71–3.2(c)2. However, pursuant to Parole Board regulation, *N.J.A.C.* 10A:71–3.3(a), young adult offenders sentenced to indeterminate terms in the Youth Complex will generally return to the streets much earlier than defendants sentenced to state prison.[5]

For example, under the Code of Criminal Justice, a twenty-six-year-old defendant convicted of second-degree robbery will presumptively be sentenced to a prison term of seven years.[6]

---

[3] While the drafters of the Code of Criminal Justice did not adopt the Model Penal Code's exact youthful offender provision, they did draw, in substantial part, on the American Law Institute's work in drafting the Model Penal Code. New Jersey Criminal Law Revision, *Final Report* at x (1971).

[4] In reality, however, after the application of commutation, program and other credits, *see N.J.A.C.* 10A:71–3.2(g), inmates are often released on parole sooner.

[5] Just as state prison inmates are routinely released prior to their primary parole eligibility date, so are young adult offenders. *See N.J.A.C.* 10A:71–3.3(g) (applying program participation and other credits to reduce primary parole eligibility dates for young adult offenders). Therefore, I suspect, and data compiled in the judiciary's sentencing database suggest, that the difference between the regulatory schedule for young adult offenders and the one-third rule for prison inmates is paralleled by the disparity in actual release dates after application of the appropriate credits.

[6] The disparity between a sentence to state prison and an indeterminate term in the Youth Complex would be even greater if the sentencing court were to impose a state prison term greater than the presumptive term. The resulting disparity, while hypothetically huge, is unlikely to arise because a defendant who would be sentenced to a greater-than-presumptive term would probably not be a likely candidate for young adult offender treatment.

*N.J.S.A.* 2C:44–1f(c). Applying the one-third rule, the defendant will be eligible for parole after twenty-eight months. If, however, the defendant were twenty-five and the sentencing court decided that young adult offender treatment was appropriate, the defendant would probably receive an indeterminate term of up to five years. *N.J.S.A.* 30:4–148 (providing five-year maximum for indeterminate sentences, unless maximum term for offense is greater than five years and good cause is shown).[7] Then, according to the parole eligibility schedule contained in the Parole Board regulations, the twenty-five-year-old defendant would be eligible for parole from the Youth Complex after only twenty months, twenty-nine percent faster than the twenty-six-year-old defendant sentenced to state prison.

The difference is even more pronounced when the defendant is convicted of a first-degree crime (other than first-degree robbery).[8] The presumptive term for a person convicted of aggravated sexual assault is fifteen years, *N.J.S.A.* 2C:44–1f(b); under the one-third rule, he or she will be presumptively eligible for parole after five years. In contrast, under the young adult offender schedule, that defendant would be presumptively eligible for parole after only thirty-two months—forty-seven percent sooner

---

[7] According to data from the judiciary's sentencing database, more often than not, a defendant convicted of a first- or second-degree crime is given only the ordinary five-year maximum indeterminate term.

[8] Certain anomalies exist in the sentencing scheme for young adult offenders that create even greater disparities; the standards for parole eligibility set by Parole Board regulation do not precisely parallel the severity of sentences imposed by statute. Presumably the differences reflect a judgment by the Parole Board about the relative ease of rehabilitating young adults guilty of certain offenses that does not correspond to the conclusions reached by the Legislature about the general need for incarceration of those criminals.

Armed robbery is one such anomalous offense. A defendant sentenced to state prison for fifteen years for first-degree armed robbery will presumptively be eligible for parole after sixty months; but if sentenced as a young adult, the same defendant would be presumptively eligible for parole after only twenty-eight months—fifty-three percent sooner. The comparable disparity for other first-degree crimes is only forty-seven percent.

than if the defendant had been sentenced to prison. The differential is stark, and suggests the question of whether it accords with legislative intent.

The question that might have been, but was not, raised in this matter is whether the youth correctional option exists at all for first-degree and second-degree offenders. The only question presented to the Court, assuming the option exists, was whether it remains the preferred option as decided in the case of *State v. McBride*, 66 *N.J.* 577, 334 *A.*2d 27 (1975). Today's decision holds that it is no longer preferred, that by virtue of the Code of Criminal Justice it has become simply an option, available to the sentencing court along with other options, including, obviously, the option of sentencing to the prescribed first- and second-degree terms under *N.J.S.A.* 2C:44–1d. While the question was not raised before us, as a practical matter the Court's decision today probably removes the possibility of a ruling that youth correctional sentencing is not available for first- and second-degree offenders. I am inclined to believe such practical impact is correct—*i.e.*, I do not believe such an exception to the youth correction statute should be implied.

We faced a similar question in *State v. Des Marets*, 92 *N.J.* 62, 455 *A.*2d 1074 (1983), where it was contended that the Graves Act had the effect of impliedly repealing the young adult offender statute for youthful Graves Act offenders. The difference in outcome between the two cases—in *Des Marets* we held there *was* such an implied repealer, but in the present case we implicitly find none—can be explained by the differences in legislative history and the consequent conclusions about presumed legislative intent. In *Des Marets* we concluded that a subsequent legislative enactment demonstrated a clear intent to effect such a repeal; here no such enactment exists; indeed the legislative history, if anything, suggests the continued availability of the youth correctional option for first- and second-degree offenders. Nevertheless, as noted above, the inconsistency in the present case exists, arguably just as strongly as it did in *Des Marets*, resulting however not from

subsequent legislative enactment but from this Court's subsequent decisions.

In *Des Marets,* we considered the relationship between the young adult offender statute and the Graves Act. The Code of Criminal Justice was enacted in 1978 with a provision for youth correctional sentences that contained no exceptions. Then the Graves Act was adopted in 1981. *L.* 1981, *c.* 31 (codified at *N.J.S.A.* 2C:43–6, 2C:43–7 and 2C:44–3). It provided that if, in connection with the commission of certain offenses of varying degrees, some of them third- and fourth-degree offenses, the offender used or had possession of a gun, the court was obliged to include in the sentence at least three years of parole ineligibility, and had the option to impose parole ineligibility up to one-half of the term. The Court regarded the legislative intent as expressed in that draconian measure as so strong that shortly after its adoption, the Court provided by order that no plea bargaining of such offenses would be permitted. The exceptions to the prohibition were narrow. Supreme Court Administrative Directive No. 10–80, *N.J.L.J.,* May 7, 1981, at 1.

In *Des Marets* it was contended that a youth correctional option was available to the trial court even though the offense was a Graves Act offense requiring imprisonment with a parole ineligibility term (as compared to the indeterminate term at the Youth Complex that was permissible under the young adult offenders statute). We concluded, in view of our understanding of the legislative determination invariably to impose the punishment provided for in the Graves Act, that the Legislature had intended to remove youth correctional treatment as an option in those cases, thereby impliedly partially repealing the youth correctional scheme. *Des Marets, supra,* 92 *N.J.* at 76–77, 455 *A.*2d 1074. The Legislature, in effect, concurred with our conclusion, for soon after *Des Marets* it amended the Graves Act but only to allow the mandatory sentence with parole ineligibility to be served in the Youth Complex rather than in prison. *L.* 1983, *c.* 92, § 1. This Court's conclusion that Graves Act sentencing terms were manda-

tory, *i.e.*, that a youth correctional indeterminate sentence was impermissible, was explicitly confirmed.

In the case before us we have no such subsequent legislation, at least not of the kind involved in *Des Marets*. Both the youth correctional provisions and the first- and second-degree punishment, including the "presumption of imprisonment," are found in the original Code of Criminal Justice—no subsequent legislative intent appears. Indeed, the only substantive amendment to the statute can be read to support a contention that the Legislature intended youth correctional treatment to be available for first- and second-degree youthful offenders. In 1983, as noted above, the Legislature modified that portion of the Code involving the youth correctional system by mandating a term of imprisonment without parole for Graves Act offenders under twenty-six, but allowed that term to be served at the Youth Complex. *L.* 1983, *c.* 92, § 1. If anything, that amendment bolsters the conclusion, simply by the clear legislative recognition of the existence of the youth correctional option and its revision without in any way limiting the availability of that option for first- and second-degree offenders. The conclusion is fair that even though the Legislature had provided severe penalties for first- and second-degree offenders, and made prison the presumptive sentence, *N.J.S.A.* 2C:44–1d, at the same time it wanted to preserve the rehabilitative possibilities involved in the youth correctional scheme.

What happened thereafter was not a legislative amendment, but a series of decisions by this Court that gave full effect to that presumption of imprisonment, an effect, I suggest, that imputes to the Legislature an intention of severity in connection with first- and second-degree offenses every bit as strong as the intention we attributed to the Legislature when it passed the Graves Act.

In *State v. Roth*, 95 *N.J.* 334, 471 *A.2d* 370 (1984), this Court construed the portion of the Code providing that a sentencing court may disregard the presumption of imprisonment for first- and second-degree offenders only if "having regard to the character and condition of the defendant [it] is of the opinion that his

imprisonment would be a serious injustice which overrides the need to deter such conduct in others." *Id.* at 358, 471 *A.*2d 370. Roth, who pleaded guilty to first-degree aggravated sexual assault, was unable to overcome the presumption by providing evidence of good moral character from "parish priests, employers, friends, relatives, neighbors, naval shipmates, and drug treatment professionals." *Id.* at 341, 471 *A.*2d 370. Even when supplemented by what the trial court considered mitigating factors, including "the defendant's alcohol and drug problems, his clean record, the unlikelihood that he would commit another crime, and his willingness to cooperate with law enforcement authorities," *id.* at 367, 471 *A.*2d 370, this Court held that Roth had failed to overcome the presumption. *Id.* at 369, 471 *A.*2d 370.

The standard, "a serious injustice which overrides the need to deter such conduct in others," will rarely be satisfied. *Id.* at 359, 471 *A.*2d 370. We have made it clear that "[t]his standard is met only in *truly extraordinary and unanticipated circumstances.*" *Id.* at 358, 471 *A.*2d 370 (emphasis added). Indeed, the only case in which this Court has approved a noncustodial sentence for a first- or second-degree offender involved truly extraordinary circumstances. In *State v. Jarbath,* 114 *N.J.* 394, 555 *A.*2d 559 (1989), a psychotic defendant pleaded guilty to second-degree manslaughter of her infant son but continued to insist that her son had died accidentally. *Id.* at 398, 555 *A.*2d 559. In fact, the cause of death was never precisely determined. *Id.* at 399, 555 *A.*2d 559. The defendant was sentenced to a prison term, and while in prison attempted suicide and was regularly abused. *Id.* at 398, 555 *A.*2d 559. The Appellate Division resentenced the defendant to probation. *Ibid.* This Court cautiously approved the noncustodial sentence, remarking that the defendant probably could not comprehend that she had committed a crime and that a prison term would probably not modify her behavior. *Id.* at 408–09, 555 *A.*2d 559.

Three cases addressing the issue of what constitutes a "sentence of imprisonment" for first- and second-degree offenders under

*N.J.S.A.* 2C:44–1d also interpreted the statute strictly, attributing an unyielding intent to the Legislature. First, in *State v. O'Connor*, 105 *N.J.* 399, 522 *A.2d* 423 (1987), this Court held that a "split sentence," *i.e.*, imprisonment for a term as a condition to probationary release, was not a sentence of imprisonment that satisfied the statute. Similarly, in *State v. Rivera*, 124 *N.J.* 122, 590 *A.2d* 238 (1991), we decided that suspension of the imposition of a sentence, pursuant to *N.J.S.A.* 2C:43–3, does not satisfy the requirement of imprisonment either. Finally, in *State v. Cannon*, 128 *N.J.* 546, 608 *A.2d* 341 (1992), we concluded that sentences to the State's Intensive Supervision Program, which allows prison inmates to be safely released into the community before expiration of their prison terms, were not sentences of imprisonment.

It is apparent, therefore, that today we have a system that is rather clearly unbalanced in terms of its punishment scheme. Defendants twenty-six and over who commit a first- or second-degree crime are almost certain to be imprisoned, and for very substantial terms. As a practical matter the exceptions are so minimal as to be almost nonexistent. Defendants eighteen to twenty-five, however, who commit exactly the same offenses may find the option of a youth correctional term available: they may receive an indeterminate sentence and be sent to the youth correctional institution and will achieve freedom much sooner than their older counterparts.

Whether the system makes sense is for the Legislature to decide, and certainly the factor of potential rehabilitation may be deemed by that body to justify that special option given in the case of youthful offenders. But, as we pointed out in *Des Marets*, if deterrence was at the top of the Legislature's list, it is far from clear that youthful offenders should be allowed to avoid first- and second-degree punishment, for they commit those offenses in disproportionate numbers. While those aged eighteen to twenty-five constitute about fourteen-and-a-half percent of the adult population in New Jersey, Bureau of the Census, U.S. Dep't of Commerce, Census Rep. # 1990 CP–1–32, *1990 Census of Popula-*

*tion, General Population Characteristics—New Jersey* 137 (1992), they constitute forty-five percent of the adults arrested for serious crimes. Division of State Police, State of New Jersey, *1990 Crime in New Jersey—Uniform Crime Report* 42–43. If this Court's conclusions about legislative intent as expressed in *Jarbath* and *Roth* in connection with the imprisonment presumption for first- and second-degree offenses are correct, it is possible, given these statistics, that the Legislature might not have intended youth correctional treatment to be available for such offenders where first- and second-degree crimes are involved.

WILENTZ, C.J., concurs in the result.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.