SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## State v. Orlando Trinidad (A-65-18) (081881)

**Argued November 4, 2019 – Decided March 18, 2020**

**Timpone, J., writing for the Court.**

Defendant Orlando Trinidad, formerly an officer with the Bloomfield Police Department (BPD), was tried for misconduct, making false statements, falsifying records, and other offenses following an automobile stop gone awry. In this appeal, the Court considers several evidentiary issues and rulings that arose at trial. First, the Court considers whether a police officer's testimony that Trinidad's actions "appeared to have been criminal" unfairly influenced the jury and prejudiced Trinidad's trial. Second, the Court considers whether the trial judge should have barred the victim's testimony with respect to high-profile police brutality cases under N.J.R.E. 403 because it was prejudicial. The Court also considers Trinidad's challenges to his sentence and to the trial court's denial of his motion for a judgment of acquittal.

At trial, the arresting officers and the victim, Marcus Jeter, disputed what occurred on the evening of June 7, 2012. BPD Officer Sean Courter's report stated that Jeter refused "multiple commands to shut off the vehicle and show me his hands," and "verbal commands to open the door." Trinidad's report stated that he observed Jeter "grabbing Officer Courter[']s service weapon" and that Jeter "struck me in the face with a closed fist." BPD Officer Albert Sutterlin's report mirrored Trinidad's report that "Jeter struck Officer Trinidad in the face."

Jeter testified that Courter and Sutterlin had their guns drawn. Dash-cam footage from Courter's and Sutterlin's vehicle corroborated Jeter's testimony. A camera on Trinidad's vehicle showed Jeter's hands are up, and he never reaches for Courter's gun. The recordings further show Trinidad and Sutterlin join Courter and pin Jeter down while Courter handcuffs him. Jeter never strikes any of the officers. Trinidad elbows Jeter three times in the back of the head. Trinidad picks Jeter up, slams him onto the hood of his patrol car, and punches him in the head.

The Essex County Prosecutor's Office (ECPO) ultimately charged Jeter with eluding, resisting arrest, assault on an officer, trying to disarm an officer, and several motor vehicle offenses. On June 12, 2012, Jeter filed a complaint with the ECPO. The ECPO contacted BPD's Internal Affairs Division (IAD). After reviewing the incident

1

reports and the other available evidence, Lieutenant Michael Cofone of the IAD exonerated the officers.

On April 3, 2013, the ECPO notified Cofone of the existence of the dash-cam recording from Trinidad's patrol vehicle. The video showed that all three officers lied in their reports. Following an investigation, the ECPO dropped all charges against Jeter.

The State took Courter and Trinidad to trial together. On direct examination, the State asked Jeter why he refused to get out of the car. Jeter referenced Amadou Diallo, a black man who had been shot and killed by police in a well-publicized incident from 1999. Courter's defense counsel objected but then withdrew the objection. Later during Jeter's direct examination, the State asked Jeter why he conducted media interviews. Jeter explained that he "did the interviews, because . . . [he has] watched, you know, the Rodney Kings and Sean Bells --" but Courter's defense counsel interrupted with another objection. The judge gave the jury a limiting instruction at Trinidad's counsel's request. Jeter then continued his testimony, stating, "I grew up in a society where, you know, you watch these . . . situations with police brutality -- you watch the Sean Bells, the Amadou Diallos, the Rodney Kings, the Oscar [Grants] and the Fruitvale Stations, and . . . I can testify that I'm a victim of that. I can say that this is my testimony."

The State also called Cofone to testify as a lay witness. Cofone narrated the events of Trinidad's dash-cam video for the jury, after which he testified that Trinidad's and Courter's actions "appeared to have been criminal."

The judge denied Trinidad's motion for judgment of acquittal. The jury then found Trinidad guilty on five of the six counts charged and the lesser-included offense of fourth-degree simple assault. The judge sentenced Trinidad on second-degree official misconduct to the mandatory minimum five-year term of imprisonment with five years of parole ineligibility and ran the four remaining convictions concurrently. The judge found three mitigating factors and one aggravating factor, but rejected Trinidad's request for a downgraded sentence, finding that Trinidad could not demonstrate any serious injustice. The judge also refused to waive the mandatory minimum term for his sentence.

The Appellate Division substantially affirmed but remanded for resentencing due to an issue not relevant to this appeal. The Court granted Trinidad's petition for certification. 237 N.J. 312 (2019).

**HELD:** The trial court erred by admitting both prejudicial testimony and, separately, lay opinion testimony as to defendant's guilt. Yet, the evidence against Trinidad was overwhelming, and any error was therefore harmless. There was no error in the sentencing of defendant or the denial of his motion for a judgment of acquittal.

1.  The Court reviews Cofone's testimony that the officers' actions "appeared to have been criminal" for plain error because neither Trinidad's nor Courter's defense counsel objected at trial.  Police officers may not opine directly on a defendant's guilt in a criminal case.  The Court agrees with the Appellate Division that the trial judge should have instructed the jury to disregard that testimony.  Those five words were not the sole basis of Cofone's testimony, however, and they did not constitute plain error.  Cofone's statement aside, the jury had Trinidad's written reports and could compare them to the two dash-cam recordings that were played several times at trial.  In light of Trinidad's demonstrably false reports, the Court does not find the erroneous admission of Cofone's statement led the jury to a result it otherwise might not have reached.  (pp. 20-24)

2.  The Court next considers Jeter's testimony with respect to high-profile police brutality cases and agrees with the trial judge that the testimony was relevant under N.J.R.E. 401.  Jeter's refusal to leave his car was essential to the jurors' evaluation not only of his actions, but also the officers'.  Nevertheless, N.J.R.E. 403 sets limits on this type of testimony.  Jeter's multiple declarations that his fear stemmed from notorious episodes of police brutality were highly prejudicial.  Those controversial references could inflame the passions of the jury, tainting their evaluation of Trinidad.  It is hard to envision ever satisfying Rule 403 at a criminal trial with references to high-profile police brutality cases.  The same analysis would apply were the roles reversed.  If Trinidad were asked why he drew his weapon while chasing a suspect, it would be improper under N.J.R.E. 403 for him to respond by discussing horrific incidents in which officers were harmed, or relaying statistics about shootings of police officers on duty.  The instruction the judge gave the jury did not solve the problem.  It permitted the jury to consider those references insofar as they related to Jeter's state of mind.  The proper course would have been to strike the references altogether and advise the jury accordingly.  The judge's failure to do so was error.  That error, however, was harmless considering the overwhelming evidence of Trinidad's guilt before the jury.  (pp. 24-31)

3.  Trinidad argues it was error not to downgrade his sentence.  The Criminal Code allows a sentencing judge to downgrade a first- or second-degree offense where "the mitigating factors substantially outweigh the aggravating factors <u>and</u> where the interest of justice demands."  N.J.S.A. 2C:44-1(f)(2) (emphasis added).  Here, the judge did not make a finding that the mitigating factors "substantially outweighed" the aggravating factor.  The Court does not reach Trinidad's argument about the first prong of the downgrading test, however, because he cannot satisfy the "interest of justice" prong.  There is no doubt Trinidad's crimes are of a serious nature, and third-degree official misconduct has a pecuniary element that would not have fit here.  The record shows Trinidad personally assaulted Jeter, lied in official reports to cover up his crimes, and similarly instructed Sutterlin to falsify reports.  A downgrade would have been inappropriate.  (pp. 31-36)

3

4.  Relatedly, a court may waive or reduce a mandatory minimum term for crimes involving public employment "[i]f the court finds by clear and convincing evidence that extraordinary circumstances exist such that imposition of a mandatory minimum term would be a <u>serious injustice</u> which overrides the need to deter such conduct in others." N.J.S.A. 2C:43-6.5(c)(2) (emphasis added).  The "serious injustice" threshold is higher than the showing necessary to downgrade an offense.  In weighing the aggravating and mitigating factors, the trial judge held that the mitigating factors were not so "extraordinary" as to merit waiver or reduction of the mandatory minimum prison term and did not overcome the need to deter such conduct by police officers.  The Court agrees.  Trinidad brutally assaulted a defenseless person who was not resisting arrest.  He then lied to cover up his crimes.  He simply has not made the requisite showing for waiver or reduction of his mandatory minimum sentence.  (pp. 36-39)

5.  Trinidad also appeals the trial judge's denial of his motion for judgment of acquittal, but the Court agrees with both the trial judge and Appellate Division that a reasonable jury could find Trinidad guilty of each charge.  The strength of the State's case leads to no other conclusion.  (p. 39)

**The judgment of the Appellate Division is AFFIRMED.**

**JUSTICE ALBIN, dissenting,** expresses the view that trial errors were not harmless beyond a reasonable doubt.  Justice Albin explains that Jeter's state of mind was not at issue and therefore not relevant under N.J.R.E. 401 and that, even assuming that Jeter's references to sensational cases of police brutality against people of color had some minimal probative value, it was substantially outweighed by the risk of undue prejudice under N.J.R.E. 403.  In Justice Albin's view, permitting the jury to draw a connection to past cases of police misconduct created an intolerable risk that the jury condemned Trinidad on the basis of collective guilt.  Justice Albin further explains that the Court has repeatedly held that a police-officer witness may not venture an opinion on a defendant's guilt and that Cofone's testimony had the clear capacity to undermine the jury's exclusive role as factfinder and deprive Trinidad of a fair trial.  Justice Albin also cautions courts about the overuse of the harmless-error doctrine.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion.  JUSTICE ALBIN filed a dissent, in which JUSTICE LaVECCHIA joins.**

4

SUPREME COURT OF NEW JERSEY

A-65 September Term 2018

081881

State of New Jersey,

Plaintiff-Respondent,

v.

Orlando Trinidad,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| November 4, 2019 | March 18, 2020 |

David A. Gies, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; David A. Gies, of counsel and on the briefs, and Richard Sparaco, Designated Counsel, on the briefs).

Kayla E. Rowe, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Kayla E. Rowe, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

1

Dillon J. McGuire argued the cause for amicus curiae Civil Rights Protection Project of the Latino Leadership Alliance of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the brief).

JUSTICE TIMPONE delivered the opinion of the Court.

Defendant Orlando Trinidad, formerly an officer with the Bloomfield Police Department (BPD), was tried for misconduct, making false statements, falsifying records, and other offenses following an automobile stop gone awry. In this appeal, the Court considers several evidentiary issues and rulings that arose at trial. We find that the trial court erred by admitting both prejudicial testimony and, separately, lay opinion testimony as to defendant's guilt. Yet, we find the evidence against defendant to be overwhelming and any error to be harmless. We find no error in the sentencing of defendant or the denial of his motion for a judgment of acquittal, and we affirm the judgment of the Appellate Division.

## I.

We cull these facts from the trial record below.

A.

At trial, the arresting officers and the victim, Marcus Jeter, disputed what occurred on the evening of June 7, 2012. We present both accounts, beginning with the officers' versions as recounted in their reports.

The Officers' Reports

BPD Officer Sean Courter's written report stated:

> Responded to . . . West Passaic Ave. on a report of a Domestic. Upon arrival Officer Sutterlin and I rang the doorbell to the residence. While ringing the doorbell a black male, later identified as Mr. Marcus Jeter, stuck his head out the second floor window and stated, "Come and get me". A female, later identified as Ms. Tanisha Killian, then opened the front [door]. While speaking with Ms. Killian, the girlfriend, she stated that her boyfriend, Mr. Jeter, just jumped out the back window. Officer Sutterlin and I heard an engine starting from the rear of the residence. A vehicle . . . came up the driveway at a high rate of speed. I stated to the driver, Mr. Jeter, to put the vehicle in park and give me his [i]dentification. Mr. Jeter ignored my order to put the vehicle in park and stated, "I did not do anything wrong". I spoke to Mr. Jeter through the front passenger side window, which was rolled down. As Mr. Jeter was speaking, I smelled a strong odor of an alcoholic beverage em[a]nating from his breath and his eyes being bloodshot. In further observing the vehicle I observed the rear driver tire to be flat. I asked Mr. Jeter again to put the vehicle in park and give me his identification. Mr. Jeter refused and drove off at a high rate of speed, making a left onto West Passaic Ave. I ran to my vehicle and advised Central Communications and [Lieutenant Sean] Schwindt that I was pursuing this

3

vehicle. I activated my emergency lights and sirens and was able to view Mr. Jeter's vehicle make a right onto Broad St. from West Passaic Ave. Upon reaching Broad St., I observed Mr. Jeter's vehicle make a right into the [Garden State] Parkway South['s] [s]ervice entrance. I was able to catch up to Mr. Jeter's vehicle on the Parkway South. I pulled behind Mr. Jeter's vehicle, who continued to drive on the Parkway South. At this time, I observed the driver-side rear tire to be sparking, due to that Mr. Jeter was driving on the rim. After approximately 1,000 feet, Mr. Jeter's vehicle became disabled, due to that the driver-side rear rim was on its side. Mr. Jeter's vehicle came to rest at mile marker 154.1 on the Parkway South. I exited my vehicle with my handgun drawn on Mr. Jeter, who was still in the vehicle with the engine running. I gave Mr. Jeter multiple commands to shut off the vehicle and show me his hands. Mr. Jeter refused and stated "[f]uck [y]ou, I did not do anything". Officer Sutterlin then arrived on scene. At that time I proceeded to the driver side door and attempted to open it. The door was locked. I again gave Mr. Jeter verbal commands to open the door. Mr. Jeter refused and stated "[f]uck [y]ou" and then rolled up his driver side window. I advised Central Communications that Mr. Jeter was refusing to exit the vehicle. Officer Trinidad arrived on scene and blocked Mr. Jeter's vehicle in from the front[] due to that Mr. Jeter refused to turn off his vehicle.

BPD Officer Orlando Trinidad's report continued the officers' account:

I took Parkway North to the motor vehicle stop. When I reached their location[,] I carefully crossed the black top median yielding to traffic. When I saw that no traffic was coming[,] I drove across [with my] lights and sirens still activated and parked my vehicle . . .

4

bumper to bumper with [Jeter's] vehicle so that he would not attempt to flee or use his vehicle as [a] weapon . . . . When I exited my vehicle[,] I observed Officer[s] Courter and . . . Sutterlin giving multiple commands for [Jeter] to . . . . "[e]xit the vehicle[!]" I immediately began giving verbal commands to [Jeter] to "[e]xit the vehicle . . . . [as he was] under arrest[!]" [Jeter] refused multiple verbal commands from Officer Courter and myself. At this time I verbally advised [Jeter] that if he did not exit the vehicle we were going to breach the window to effect the arrest. [Jeter] ignored my commands again[,] stating to us[,] "Fuck off[!] I didn't do shit man[!]" Officer Courter then attempted to open the driver side door but the door was locked. Officer Courter then used his asp (expandable baton) and successfully breached the window. Multiple verbal commands were given to [Jeter] to unlock the door and exit his vehicle, [but] he refused. Officer Courter reached into the driver side window and opened the door. Officer Courter ordered [Jeter] to take off his seat belt and exit the vehicle. [Jeter] refused to comply. Officer Courter reached over [Jeter] to take off his seat belt, at which time I observed [Jeter] grabbing Officer Courter[']s service weapon which he had holstered on his right hip. Officer Courter yelled . . . [,] "He's grabbing my gun[!] He's grabbing my gun[!]" Officer Courter gave [Jeter] multiple[] commands to let go of his gun and stop resisting. At that moment I was in fear for my partner[']s life[] and my own. Officer Sutterlin and I proceeded to grab Mr. Jeter's hands off Officer Courter's gun. Officer Courter was able to remove [Jeter's] seatbelt . . . . [When] attempting to extradite [Jeter] from the vehicle, [Jeter] struck me in the face with a closed fist. After struggling with [Jeter,] we finally managed to take him to the ground. On the ground[, Jeter] continued flailing his arms and then plac[ed] his hands underneath his body. I ordered him

5

to . . . "stop resisting . . . [and g]ive me [his] hands[!]" And he refused. After struggling with Mr. Jeter we finally were able to grab his hands and place him under arrest.

[(emphases added).]

Courter's and BPD Officer Albert Sutterlin's reports of the struggle mirrored Trinidad's, though Courter added:

I had to reach over Mr. Jeter[] to remove his seatbelt, but as I was reaching over[,] Mr. Jeter began grabbing onto my holster attempting to remove my handgun. I was scared from my life. I stated he is going for my gun. Officer Trinidad and Officer Sutterlin immediately came to my aid and restrained Mr. Jeter's hands from removing my handgun. Mr. Jeter continued to resist our efforts to arrest him. We stated multiple times to stop resisting. Mr. Jeter continued to flail his arms and body in an attempt not to be removed from the vehicle. . . .

[(emphasis added).]

In his supplementary offense report, Courter stated, "While at Police Headquarters, EMS . . . was contacted to clean out minor lacerations to my left forearm and clean out minor abrasions on Mr. Jeter. Mr. Jeter refused further medical attention." (emphases added).

For his part, Sutterlin added:

At this time, Officer Courter stated that Mr. Jeter was attempting to take Officer Courter's weapon. At this time, this officer and Officer Trinidad reached in to

6

assist Officer Courter and extricate[] Mr. Jeter during which time[] <u>Mr. Jeter struck Officer Trinidad in the face</u>.  Mr. Jeter was ordered several times to stop resisting, but Mr. Jeter continued to fight with the officers.  Mr. Jeter was brought to the ground and continued to resist by putting his hands underneath his body.

[(emphasis added).]

<u>Jeter's Testimony and the Dash-Cam Footage</u>

According to Jeter, a different version of events unfolded that night.  He testified that he and his live-in girlfriend were engaged in a heated argument, which led her sister to call the police.  Courter and Sutterlin arrived around midnight when Jeter had already removed himself from the situation and gotten into his car.  Jeter claimed the officers flagged him down as he drove toward the end of his driveway and they briefly spoke without incident, permitting Jeter to drive off.

Jeter headed to the auto shop he managed in order to fix a tire with low air pressure.  On the Garden State Parkway, however, Courter and Sutterlin pulled him over.  At this point, dash-cam footage from their vehicle corroborates the remainder of Jeter's testimony.  The footage reveals Courter a few feet from the driver's side window with his gun drawn telling Jeter to "get the fuck out the car."  Sutterlin also has a gun drawn.  Jeter refuses to comply and indicates he will not move until the officers call his lawyer.

7

Officer Orlando Trinidad arrived on the scene to assist Courter and Sutterlin. A camera on his vehicle also recorded the encounter. The footage shows Trinidad drive over the median and crash into the front of Jeter's stationary car. Jeter's hands are up from the moment Trinidad crashes into his car and Jeter comes into view. Trinidad exits his vehicle and approaches the passenger side of Jeter's car, but then runs out of sight. At the same time, Courter breaks the driver's side window with a baton, enters the car, and grabs Jeter. Jeter never reaches for Courter's gun. Courter spontaneously yells at Jeter to "stop trying to take my gun." Courter then unfastens Jeter's seatbelt while Jeter's hands remain raised.

The recordings further show Courter remove Jeter from the car and bring him to the ground. Trinidad and Sutterlin join Courter and pin Jeter down while Courter handcuffs him. Jeter never strikes any of the officers. Unprovoked, Trinidad yells, "Why are you trying to get my fucking gun?" Jeter, now handcuffed and lying on his stomach, denies the charge. While he remains on the ground, they search his pockets. As Courter had done before, Trinidad tells Jeter to "get off my gun," and then elbows Jeter three times in the back of the head.

Trinidad is clearly visible as he picks Jeter up and, with the other officers, walks him to a patrol car. Jeter states twice that he "did nothing

8

wrong." Rather than place him inside the car, Trinidad slams him onto the hood so hard that Jeter's feet leave the ground. Trinidad then leans into Jeter's face and tells him to "shut the fuck up." After removing Jeter from the hood of the car, Trinidad punches him in the head.

B.

Following Jeter's arrest, the Essex County Correctional Facility refused to admit him because of the extent of his injuries. As a result, officers took him to Clara Maass Medical Center where hospital records indicate he was diagnosed with head trauma, contusions, a right wrist sprain, and an ear laceration. Jeter's ear would not stop bleeding, requiring liquid stitches. Doctors also gave him a sleeve for his wrist. The Essex County Prosecutor's Office (ECPO) ultimately charged Jeter with eluding, resisting arrest, assault on an officer, trying to disarm an officer, and several motor vehicle offenses, including driving while intoxicated.

On June 12, 2012, Jeter filed a complaint with the ECPO about the arresting officers' conduct. The ECPO contacted BPD's Internal Affairs Division (IAD). In an interview with Lieutenant Michael Cofone of the IAD, Jeter explained his version of events. Cofone obtained Courter's and Sutterlin's incident reports, the dash-cam video recording from Courter's patrol car, and radio and telephone recordings. However, another detective

9

informed Cofone that the dash-cam video from Trinidad's patrol car was unavailable. Cofone also asked Trinidad, Courter, and Sutterlin to submit supplemental administrative reports of the incident.

After reviewing those reports and the other available evidence, Cofone exonerated the officers. Cofone found that Jeter's conduct precipitated the event and that Jeter lacked credibility, was uncooperative, actively resisted the officers' attempt to arrest him, attempted to grab Courter's weapon, and punched Trinidad in the face.

But then everything changed. On April 3, 2013, the ECPO notified Cofone of the existence of the dash-cam video recording from Trinidad's patrol vehicle. The video showed a very different version of the incident than what the officers had reported. Cofone concluded from his review of the video that all three officers lied in their reports by falsely stating, among other things: Jeter grabbed for Courter's gun; Trinidad and Sutterlin came to Courter's aid and restrained Jeter's hands from removing the gun; Jeter flailed his arms and body "when in reality Jeter ha[d] his hands up in a gesture of surrender the entire time"; and Jeter struck Trinidad in the face with a closed fist as Courter removed him from the car. Cofone also indicated that, once Jeter was handcuffed, Trinidad slammed him into the hood of his patrol vehicle and "punche[d] Jeter so hard in the head that his punch not only hit[]

10

Jeter but careen[ed] off Jeter and hit[] Courter in the face as well." Following an investigation, the ECPO dropped all charges against Jeter.

C.

The State took Courter and Trinidad to trial together, specifically charging Trinidad with second-degree conspiracy to commit official misconduct, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:30-2; second-degree official misconduct, N.J.S.A. 2C:30-2; third-degree tampering with public records, N.J.S.A. 2C:28-7(a)(1) and (2); fourth-degree falsifying or tampering with records, N.J.S.A. 2C:21-4(a); fourth-degree false swearing, N.J.S.A. 2C:28-2; and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7).

Sutterlin pled guilty to fourth-degree falsifying or tampering with records and agreed to testify against Courter and Trinidad. At trial, he stated that Trinidad and Courter waited for him at police headquarters after the incident. He asked them what happened in order to provide a similar incident report. They "reminded [him] of what happened" and told him what to write. Specifically, they told Sutterlin to state that Jeter grabbed for Courter's gun and that Jeter struck Trinidad, but Sutterlin testified he saw neither event. Sutterlin further admitted that he spoke to Trinidad and Courter "several times" to get the "sequence of events correct" before submitting the administrative report to Cofone.

At trial, during opening statements, Trinidad's counsel remarked that Jeter had engaged with the media before trial and was a "big time celebrity now basking in the afterglow." Trinidad's counsel further underscored that Jeter had filed a "civil suit for big dollars," that the incident with the officers was the "break of his life," and that Jeter was "living the American dream."

On direct examination, the State asked Jeter why he refused to get out of the car. Jeter answered that he kept his hands raised because Courter had his gun drawn. Jeter explained that he did not attempt to pick up the cell phone he dropped because he did not want Courter to mistake it for a weapon and shoot him. Jeter also referenced Amadou Diallo, a black man who had been shot and killed by police in a well-publicized incident from 1999. Courter's defense counsel objected and argued at sidebar that the reference was irrelevant and an attempt to inflame the jury. The trial judge replied that the reference served to clarify Jeter's state of mind and was not intended to inflame the jury, so Courter's defense counsel withdrew the objection.

Later during Jeter's direct examination, the State asked Jeter why he conducted media interviews. Courter's counsel objected on relevance grounds, but Trinidad's counsel confirmed that he mentioned the media appearances in his opening statement, so the judge permitted the question. Before Jeter could continue, the judge asked if anyone desired "any instruction . . . to give the

12

jury about this testimony," but neither defense counsel requested one. Jeter began again, explaining that he "did the interviews, because . . . [he has] watched, you know, the Rodney Kings and Sean Bells --" but Courter's defense counsel interrupted with another objection.

This time, Trinidad's counsel joined Courter's counsel's objection. They argued Jeter "shouldn't be mentioning other cases" and his testimony was "inflammatory." As before, the judge explained that Jeter's references reflected his state of mind, but this time the judge asked whether the parties wanted a limit on "how far into these areas [Jeter] can go." Trinidad's counsel responded, "I don't know how you can restrict him, if that's his state of mind." The judge agreed and, alternatively, Trinidad's counsel asked for a limiting instruction to explain that the jury has "heard testimony referencing other cases, that they should be aware that every case is different, and they should disregard any parallels to other cases, or consider it only for his state of mind." The judge complied, instructing the jury that "any reference the witness is making to other cases, you can only use that testimony as -- insofar as that you find it is relevant to this witness' state of mind, why he did what it is that he said that he did or didn't do." Jeter then continued his testimony:

> I grew up in a society where, you know, you watch these . . . situations with police brutality -- you watch the Sean Bells, the Amadou Diallos, the Rodney Kings, the Oscar [Grants] and the Fruitvale Stations, and I've

13

-- I've -- I can testify that I'm a victim of that. I can say that this is my testimony.

So when -- when the first initial interview was taken with Channel 7 -- and I didn't -- actually didn't want to do it at all. [Investigative reporter] Sarah Wallace actually came to my house, and she said, "[y]ou know, you have a story that the world needs to hear."

And I didn't really want to do it at all. I didn't get paid to do it. It's not -- it wasn't for fame. It was just more of me just saying this is my testimony, and the world needs to understand that people are falsely accused every day, and they deal with, you know, the things like I dealt with, of possibly being shot, and possibly being dead, you know.

My worst case scenario was me getting shot that night, you know, and with Officer Courter saying, "[s]top trying to take my gun," you know, it -- who's to say that the other two officers wouldn't have really thought that I was trying to take his gun and really would have shot me.

And then, you know, the way that everything played out as far as me getting charged, and me going to court for a year, and me dealing with the stress and the aggravation, and just being able to overcome it, I needed to tell my story, and that's what I did. I just wanted to tell my story.

It wasn't about money, it wasn't -- I didn't get paid from any of the interviews I did. I didn't look for fame, I didn't look for followers on Instagram. It was just more about like if I was in church, and this was my testimony, and I wanted everybody to understand that

14

I've been through some things that I shouldn't have gone through.

During the final jury charge, the judge reminded the jury that, if he "gave . . . a limiting instruction as to how to use certain evidence, that evidence must be considered by you for that purpose only. You cannot use it for any other purpose."

The State also called Cofone to testify as a lay witness. Cofone narrated the events of Trinidad's dash-cam video for the jury, after which the following exchange took place:

> Q. And had you requested, from Detective Zachares, the second video; in other words, the video recording from [Trinidad's patrol vehicle].
>
> A. When I first conducted my investigation, I requested from him all available evidence. That would have encompassed anything there may have been. Some things, he was aware of, as the evidence video tech.
>
> Q. After the investigation, did you change your findings or have any other findings as to the conduct of these officers at the time?
>
> A. Not immediately. I did a review of that second piece of evidence [the dash-cam video from Trinidad's patrol car] with the assistance of Sergeant Sierchio and Chief Gould.
>
> Q. Did you then make any findings?

15

A. Yes, ma'am.

Q. What were those?

A. I changed the disposition from exonerated to sustained.

        . . . .

Q. Sir, after watching this second video . . . did you -- did you conduct any further investigation?

A. Yes, ma'am.

Q. What did you do?

A. Uh, well, I informed the chief -- we saw the video -- that it appeared that, based on the new evidence, the actions of the officers, umm, <u>appeared to have been criminal</u>, and we forwarded the case to the Essex County Prosecutor's Office for a criminal review.

[(emphasis added).]

Neither defense counsel objected to Cofone's testimony.

D.

On October 28, 2015, the judge denied Trinidad's motion for judgment of acquittal. The jury then found Trinidad guilty on five of the six counts. On the remaining charge, the jury convicted Trinidad of the lesser-included fourth-degree simple assault, N.J.S.A. 2C:12-1(a), rather than third-degree aggravated assault. The judge merged his conspiracy and second-degree

16

official misconduct convictions and sentenced Trinidad on the latter to the mandatory minimum five-year term of imprisonment with five years of parole ineligibility. The judge ran the four remaining convictions concurrently.

In sentencing Trinidad, the judge applied three mitigating factors, see N.J.S.A. 2C:44-1(b)(7) ("The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense[.]"); N.J.S.A. 2C:44-1(b)(8) ("The defendant's conduct was the result of circumstances unlikely to recur[.]"); N.J.S.A. 2C:44-1(b)(9) ("The character and attitude of the defendant indicate that he is unlikely to commit another offense[.]"), and one aggravating factor, N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law[.]"). The judge, however, rejected Trinidad's request for a downgraded sentence, finding there were no compelling circumstances stemming from Trinidad's offenses meriting the downgrade. The judge further noted that third-degree official misconduct was inappropriate in Trinidad's case because Trinidad could not demonstrate any serious injustice in having him serve a five-year mandatory minimum term. The judge also refused to waive the mandatory minimum term for his sentence.

17

E.

Trinidad appealed his convictions and sentence. The Appellate Division substantially affirmed. The Appellate Division added that Trinidad's concurrently imposed sentences should have merged with his official misconduct conviction, and remanded for resentencing. The merger had no impact on Trinidad's five-year sentence.

The Appellate Division rejected Trinidad's contention that the judge erred by permitting Jeter's testimony relating to high-profile police brutality cases. In its view, Jeter's testimony was neither irrelevant nor unduly prejudicial. The other high-profile cases were only mentioned "to explain Jeter's own actions at the time of the incident, not to analogize the present case to those prior cases." Further, any prejudicial effect had been mitigated by the judge's limiting instructions to the jury and defense counsels' cross-examination highlighting the differences between those high-profile cases and Jeter's encounter with the officers.

Trinidad further argued Cofone's statement that the officers' actions "appeared criminal" was inadmissible lay opinion improperly addressing the ultimate question of guilt or innocence under N.J.R.E. 701. The Appellate Division disagreed, reasoning that Cofone's testimony did not relate "to the ultimate issue of whether Trinidad committed the offenses" but instead was

18

"rationally based on Cofone's perception and served to inform the jury how IAD conducted its internal investigation." The court added that, even if Cofone's testimony was inadmissible, its admission did not constitute plain error because of the overwhelming evidence the State presented against Trinidad.

The Appellate Division also thoroughly reviewed Trinidad's sentence. The court found that the judge properly exercised his discretion in finding aggravating and mitigating factors. The court further agreed with the judge's explanation for why Trinidad was not entitled to a downgraded sentence or waiver of the mandatory minimum term. Finally, the Appellate Division affirmed the judge's denial of Trinidad's motion for a judgment of acquittal. The court reviewed Trinidad's convictions and held that, based on the evidence presented at trial, a reasonable jury could have found him guilty beyond a reasonable doubt.

On March 26, 2019, this Court granted Trinidad's petition for certification. 237 N.J. 312 (2019). We granted leave to the American Civil Liberties Union of New Jersey (ACLU) and the Civil Rights Protection Project of the Latino Leadership Alliance of New Jersey (CRPP) to participate as amici curiae. We consider each argument raised by Trinidad in turn.

## II.

### A.

Trinidad argues that Cofone's testimony unfairly influenced the jury and prejudiced his trial. Trinidad reasserts that Cofone's testimony exceeded the bounds of N.J.R.E. 701, resulting in reversible error. The ACLU shares Trinidad's position, noting that neither expert nor lay witnesses may opine on a criminal defendant's guilt.

For its part, the State argues that Cofone's testimony served to explain the impetus for his follow-up investigation. The State posits that Cofone's testimony that the officers' actions "appeared to have been criminal" was necessary to explain a material fact, that is, the later-developed evidence of Trinidad's dash-cam recording. The State adds that, in any event, Cofone's testimony does not rise to the level of plain error requiring reversal.

### B.

### 1.

Neither Trinidad's nor Courter's defense counsel objected at trial to Cofone's testimony that the officers' actions "appeared to have been criminal." As such, we review Cofone's testimony for plain error. We consider whether Cofone's testimony was "clearly capable of producing an unjust result." R. 2:10-2. This is a "high bar," State v. Santamaria, 236 N.J. 390, 404 (2019),

requiring reversal only where the possibility of an injustice is "real" and "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Macon, 57 N.J. 325, 336 (1971).

N.J.R.E. 701 provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

As with other witnesses, we "have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. LaBrutto, 114 N.J. 187, 198 (1989).

However, police officers may not opine directly on a defendant's guilt in a criminal case. See, e.g., State v. Frisby, 174 N.J. 583, 593-94 (2002) ("Based on the hearsay evidence, the police essentially gave the jury their opinion regarding the innocence of Patterson and inferentially the guilt of [the defendant]. That is not allowed."); State v. Landeros, 20 N.J. 69, 74-75 (1955) (holding that police captain's testimony that defendant was "as guilty as Mrs. Murphy's pet pig" was so prejudicial that it warranted reversal of the conviction); see also State v. McLean, 205 N.J. 438, 453 (2011) ("[E]xperts

21

may not, in the guise of offering opinions, usurp the jury's function by, for example, opining about defendant's guilt or innocence or in a manner that otherwise invades the province of the jury to decide the ultimate question." (citation omitted)).

In Frisby, the police investigated parents for the death of their infant. 174 N.J. at 588. The mother and father gave conflicting accounts of who was responsible for the infant's care on the night in question. Id. at 588-89. After police charged the mother, they testified about their decision to arrest her and not the father. Id. at 591. Among other things, officers relayed hearsay from non-testifying witnesses that verified the father's alibi. Ibid. They also explained to the jury that they felt the father was "more credible than [the mother] at that point." Id. at 592.

We found the admission of that testimony constituted plain error beyond the simple fact that it offered inadmissible hearsay. Ibid. As the "case was a pitched credibility battle" between the mother and father, we explained that, "by 'necessary inference,'" the police testimony regarding the father's credibility unfairly and "'irresistibly' implicated [the mother]." Id. 593-96 (quoting State v. Roach, 146 N.J. 208, 224-25 (1996)). We observed that juries "may be inclined to accord special respect to" police testimony, id. at 595 (quoting Neno v. Clinton, 167 N.J. 573, 586 (2001)), and accordingly held

22

that "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal," id. at 596.

2.

Applying those principles, we agree with the Appellate Division that the trial judge should have instructed the jury to disregard Cofone's testimony that the officers' actions "appeared to have been criminal."

Those five words were not the sole basis of his testimony, however, and we do not find that they constitute plain error. In addition to simple assault, Trinidad was convicted of a series of charges relating to his false statements: tampering with and falsifying public records, false swearing, and official misconduct. Cofone's statement aside, the jury had Trinidad's written reports and could compare them to the two dash-cam recordings that were played several times at trial.

Those videos reveal Trinidad ramming Jeter's stationary car. The jury saw Jeter's hands raised in surrender when he, instead, was supposedly reaching for Courter's gun and punching Trinidad in the face. Trinidad also elbowed Jeter three times in the head while he was handcuffed on the ground, slammed him into a patrol vehicle, and punched him in the face. Jeter's testimony further corroborated the substance of the videos. Finally, Sutterlin testified that he never saw Jeter reach for Courter's weapon or assault

23

Trinidad, and illuminated exactly how the officers lied in their reports to coordinate their stories.

This case is unlike Frisby, where police testimony about the father's credibility not only implicated the mother, but also could have tipped the scales in the State's favor due to the scant evidence presented against her. Rather, in light of Trinidad's demonstrably false reports, we cannot say the erroneous admission of Cofone's statement "led the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 336; see, e.g., State v. Hightower, 120 N.J. 378, 410 (1990) (holding officer's testimony that defendant "was the person responsible for the murder" was harmless error because of "the strength of the State's case, the length of the trial, and the number of witnesses called").

### III.

### A.

Trinidad next argues the trial judge should have barred Jeter's testimony with respect to high-profile police brutality cases under N.J.R.E. 403 because it was highly prejudicial and had the tendency to inflame the passions of the jury. In Trinidad's view, Jeter's comparison of himself to Amadou Diallo, Rodney King, Sean Bell, and Oscar Grant equated Trinidad with police officers predisposed to misconduct.

The State contends that the judge properly admitted Jeter's testimony, which tended to rebut accusations that he was motivated by a desire for fame and fortune. The State contends the references to high-profile police brutality cases explained Jeter's state of mind and informed the jury of Jeter's actions during his arrest. The State further argues the jury was not prejudiced by Jeter's testimony because it was likely already aware of those high-profile cases and could distinguish between them and this case based on the cross-examination of Jeter.

The ACLU and CRPP agree with the State. Like the State, they argue Jeter's comments were relevant to explain his state of mind and actions to the jury. Amici add that there are racial disparities in policing. Therefore, Jeter's references to infamous police brutality cases were necessary to contextualize his fear as a person of color and explain why he refused to exit his car.

B.

We typically review evidentiary rulings under a deferential standard and will "uphold [the trial court's] determinations absent a showing of an abuse of discretion." State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). Yet, where the trial court fails to apply the proper legal standard in evaluating the admissibility of evidence, we review the evidentiary ruling de novo. See, e.g., State v. Garrison, 228 N.J. 182, 194

25

(2017) (applying de novo review when the trial court failed to analyze other-crime evidence under N.J.R.E. 404(b)).  Here, the judge failed to analyze Jeter's testimony for prejudice under N.J.R.E. 403, instead finding it relevant under N.J.R.E. 401 and allowing Jeter to continue.  Our review of the prejudicial effect of his testimony is therefore de novo.

C.

Evidence is relevant under N.J.R.E. 401 if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action."  A court may admit evidence it finds to be relevant, "unless exclusion is warranted under a specific evidence rule."  State v. Burr, 195 N.J. 119, 127 (2008).  "One such rule excluding relevant evidence is N.J.R.E. 403."  State v. Cole, 229 N.J. 430, 448 (2017).  N.J.R.E. 403 provides for the exclusion of evidence that is otherwise admissible "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."

Here, Trinidad focuses on the "undue prejudice" prong of Rule 403.  In determining whether the admission of certain evidence would be unduly prejudicial, a court considers whether the evidence's probative value "is so significantly outweighed by [its] inherently inflammatory potential as to have a

26

probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence." State v. Thompson, 59 N.J. 396, 421 (1971). For exclusion, the evidence must be more than prejudicial: "[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high." Cole, 229 N.J. at 448 (alteration in original) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)).

D.

Initially, we agree with the trial judge that Jeter's testimony was relevant. His refusal to leave his car was essential to the jurors' evaluation not only of his actions, but also the officers'. From the officers' perspective, Jeter's noncompliant behavior escalated the conflict. Conversely, Jeter testified he "was just afraid" because Courter and Sutterlin had their guns drawn. Whether Jeter's actions escalated the conflict was germane to the officers' fear (or lack thereof), resulting conduct, and charges. His testimony served to contextualize his fear for the jury. Accordingly, Jeter's story "had a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401.

Nevertheless, N.J.R.E. 403 sets limits on this type of testimony. Jeter's multiple declarations that his fear stemmed from notorious episodes of police

27

brutality were highly prejudicial. Those controversial references could inflame the passions of the jury, tainting their evaluation of Trinidad. Indeed, after listing incidents involving Sean Bell, Rodney King, and Oscar Grant, Jeter told the jury, "I can testify that I'm a victim of that." (emphasis added). We find that the comparison Jeter drew between himself and victims of notorious incidents of police brutality could have led the jury, in turn, to liken Trinidad to the officers in those cases. The risk of undue prejudice was simply "too high." Cole, 229 N.J. at 448. It is hard to envision ever satisfying Rule 403 at a criminal trial with references to high-profile police brutality cases.

The same analysis would apply were the roles reversed. If Trinidad were asked why he drew his weapon while chasing a suspect, he could appropriately explain that he acted out of concern for his safety under the circumstances. Both the question and answer are relevant. Yet, it would be improper under N.J.R.E. 403 for him to respond by discussing horrific incidents in which officers were harmed, or relaying statistics about shootings of police officers on duty. There is a risk that the testimony could unduly prejudice the jury against the suspect in that case.

Here, after Jeter first mentioned Amadou Diallo, Courter's counsel objected and argued the reference would inflame the jury. The prosecutor did not disagree and explained, "[t]hat's not where I was going. I was just asking

him why he didn't get out of the car, why he was throwing up his hands." At that point, the judge should have conducted an N.J.R.E. 403 analysis, stricken the reference from the record, instructed the jury not to consider it, and advised Jeter not to mention further any high-profile police brutality cases. Instead, the judge focused on N.J.R.E. 401, countered that the reference was relevant by reflecting Jeter's state of mind, and counsel withdrew the objection.

Jeter again mentioned additional episodes of police brutality in the afternoon session. The instruction the judge gave the jury did not solve the problem. It permitted the jury to consider those references insofar as they related to Jeter's state of mind. This again misses the mark. Limiting Jeter's testimony to that which makes it relevant does not cure its intrinsic prejudice. The proper course would have been to strike the references altogether and advise the jury accordingly. The judge's failure to do so was error.

### E.

We next consider whether that error was harmless. We again determine whether the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. More specifically, we consider whether the "error [was] 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" State v.

29

<u>Prall</u>, 231 N.J. 567, 581 (2018) (alterations in original) (quoting <u>State v. Daniels</u>, 182 N.J. 80, 95 (2004)). Therefore, "[t]he error must be evaluated 'in light of the overall strength of the State's case.'" <u>State v. Sanchez-Medina</u>, 231 N.J. 452, 468 (2018) (quoting <u>State v. Galicia</u>, 210 N.J. 364, 388 (2012)).

We note that Courter's counsel withdrew his objection -- which Trinidad's counsel never joined -- to Jeter's initial reference to Amadou Diallo. After Jeter later listed additional instances of police brutality, both defense counsel objected, but neither accepted the judge's offer to discuss and impose limits on Jeter's testimony. Rather, Trinidad's counsel tendered a potential limiting instruction, the very substance of which the judge gave to the jury. The judge later reminded the jury to consider evidence only in accordance with his limiting instructions throughout trial.

We cannot find that the error led to an unjust result considering the overwhelming evidence of Trinidad's guilt before the jury. The dash-cam videos and Jeter's and Sutterlin's testimony all directly controverted Trinidad's written reports, powerfully incriminating him. Even considered in conjunction with Cofone's improper remark, we are comfortable Jeter's prejudicial references did not lead to an unjust result. <u>See, e.g.</u>, <u>State v. Marrero</u>, 148 N.J. 469, 496-97 (1997) (finding insufficient instruction as to the use of other-crimes evidence harmless because "the evidence of guilt,

30

independent of the other-crime evidence, was nearly overwhelming," such that the inadequate instruction "did not tip the scales").

Although Jeter undoubtedly should not have referred to notorious cases of police brutality, we find the admission of his testimony to be a particularly powerful example of harmless error in light of the other evidence adduced at trial.

IV.

A.

Trinidad restates two challenges to his sentence. He first argues that the trial judge erred by refusing to sentence him one degree lower to third-degree official misconduct because the mitigating factors substantially outweighed the aggravating factor. He also claims the interest of justice demands a downgrade because he acted out of provocation by Jeter and the resulting "immense stress" to fabricate reports. Second, Trinidad claims extraordinary circumstances warrant waiver of the mandatory minimum term of imprisonment or period of parole ineligibility for second-degree official misconduct based on the mitigating factors and the numerous letters submitted on his behalf demonstrating his honesty, character, loyalty, and generosity. He further asserts the need for deterrence is low in this case because he already lost his job, car, and apartment, and accumulated substantial credit card debt.

31

For its part, the State contends the judge thoroughly analyzed every aggravating and mitigating factor. The State notes that, while applying more mitigating than aggravating factors, the judge did not find the mitigating factors substantially outweighed the aggravating factor. The State also argues there were no compelling circumstances warranting a downgrade because Trinidad failed to provide evidence of a less culpable mental state, diminished capacity, or other exceptional circumstance. As to Trinidad's second contention, the State responds that he will not uniquely suffer from imprisonment such that this Court should waive his mandatory minimum term of imprisonment or period of parole ineligibility.

B.

The judge sentenced Trinidad for second-degree official misconduct to a five-year term of imprisonment with five years of parole ineligibility. We review Trinidad's sentence "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). We will "not substitute [our] judgment for that of the sentencing court." Ibid. However, "the deferential standard of review applies only if the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014).

32

C.

The Criminal Code allows a sentencing judge to downgrade a first- or second-degree offense where "the mitigating factors substantially outweigh the aggravating factors <u>and</u> where the interest of justice demands." N.J.S.A. 2C:44-1(f)(2) (emphasis added); <u>accord</u> <u>State v. Megargel</u>, 143 N.J. 484, 495 (1996) ("The sentencing judge must be (1) clearly convinced that the mitigating factors substantially outweigh the aggravating factors and (2) the interest of justice must demand the downgrade."). Accordingly, downgrading, while not required, is appropriate where both prongs of the statutory test are satisfied.

While the Code does not define the "interest of justice," we have noted it is a high bar, requiring "compelling" reasons for a downgrade. <u>Megargel</u>, 143 N.J. at 500-02. In <u>Megargel</u>, we delineated several factors relevant to that determination. <u>See</u> <u>ibid.</u> Generally, the reasons that compel a downgrade must be in addition to, and separate from, the mitigating factors. <u>Id.</u> at 502. As the focus of the inquiry is on the offense rather than the offender, "the most single important factor" is the severity of the crime. <u>Id.</u> at 500. Determining a crime's severity involves consideration of the "factual circumstances," including whether the defendant's crime was "similar to a lower degree offense, thus suggesting that a downgraded sentence may be appropriate."

33

Ibid.  The defendant's role in the crime is also relevant.  Id. at 501 ("Was the defendant the mastermind, a loyal follower, an accomplice whose shared intent is problematic, or an individual who is mentally incapable of forming the necessary criminal intent?").  We further consider the sentence from the perspective of deterrence.  Ibid.  And, finally, we hesitate to downgrade where the Legislature has provided an enhanced penalty for a particular offense.  Id. at 502.

At the outset, we underscore that the judge gave Trinidad the benefit of a mandatory minimum sentence and ran the remaining counts concurrently.  The judge simply refused to take the additional step of downgrading Trinidad's sentence.  Specifically, he found the three mitigating factors predominated over the lone aggravating factor.  The judge did not make a finding that the mitigating factors "substantially outweighed" the aggravating factor.  Trinidad argues he can satisfy the first prong of the downgrading test, citing the twenty-eight letters of support submitted on his behalf and his lengthy public service with the Marines and the BPD.  Yet, we need not reach this argument because we hold that he nevertheless cannot satisfy the "interest of justice" prong.

There is no doubt Trinidad's crimes are of a serious nature.  By assaulting Jeter, Trinidad caused him to fear for his life.  As the judge noted in his determination, Trinidad "smashed the front of Jeter's car, punched Jeter

34

twice when he was outside the car on the ground, and then hit him again when he was up against the car, resulting in injuries to Jeter's arms, wrist, face and ear." Moreover, Jeter may have faced a lengthy prison sentence had Trinidad's dash-cam footage never surfaced. The most important factor in the interest of justice calculus, then, weighs against downgrading Trinidad's sentence.

The judge also found that third-degree official misconduct was inapplicable here. Third-degree official misconduct occurs where "the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less." N.J.S.A. 2C:30-2. As the judge aptly noted, Trinidad's crime was nonpecuniary. Instead, Jeter was physically injured and indicted for certain crimes he did not commit. We agree with the judge that third-degree official misconduct is therefore not fitting of Trinidad's conduct, counseling against a downgrade.

We emphasize that Trinidad played a central role in the incident. The record shows he personally assaulted Jeter, lied in official reports to cover up his crimes, and similarly instructed Sutterlin to falsify reports. By finding him guilty on all counts, the jury implicitly rejected Trinidad's contention that Jeter provoked him. Accordingly, there was no "immense stress" necessitating the

35

commission of these crimes. A downgrade would have been inappropriate here.

Lastly, while we recognize Trinidad's finances and reputation have likely suffered, the Legislature's imposition of a mandatory custodial sentence for second-degree official misconduct reflects its belief that imprisonment is necessary as a matter of general deterrence. It also underscores the Legislature's view that this is a serious crime. Based on the foregoing, we find no compelling circumstances to override that legislative determination. We agree with the judge's refusal to downgrade Trinidad's sentence and discern no abuse of discretion.

## D.

Relatedly, a court may waive or reduce a mandatory minimum term for crimes involving public employment "[i]f the court finds by clear and convincing evidence that extraordinary circumstances exist such that imposition of a mandatory minimum term would be a serious injustice which overrides the need to deter such conduct in others." N.J.S.A. 2C:43-6.5(c)(2) (emphasis added). The "serious injustice" threshold is higher than the showing necessary to downgrade an offense. Megargel, 143 N.J. at 501.

The inquiry focuses on whether the mitigating factors are "extraordinary," such that "they so greatly exceed any aggravating factors that

36

imprisonment would constitute a serious injustice overriding the need for deterrence." State v. Evers, 175 N.J. 355, 393-94 (2003). We also consider "the gravity of the offense with respect to the peculiar facts of a case to determine how paramount deterrence will be in the equation." Id. at 395. There is a presumption of valuable deterrence in a custodial term for first- and second-degree offenders. Ibid.

We have found the serious injustice standard satisfied where a psychotic woman with a severe intellectual disability accidentally killed her son by dropping him twice on a coffee table. State v. Jarbath, 114 N.J. 394, 398 (1989). We reasoned that she could not comprehend the "wrongfulness" of her conduct, thereby eliminating any specific deterrence gained from her imprisonment. Id. at 406. Her case was also unlikely to deter others from neglecting parental or childcare responsibilities based on her unique level of culpability and mental disabilities. Id. at 405-06. Furthermore, we highlighted that, due to her limitations, she could not "endure life in prison without unusual suffering, that is, hardship and privation greatly exceeding that which would be accepted and endured by ordinary inmates as the inevitable consequences of punishment." Id. at 409; see also State v. E.R., 273 N.J. Super. 262, 273-75 (App. Div. 1994) (affirming resentencing of defendant to

37

no custodial term where he had AIDS and his death was imminent within six months).

Here, Trinidad's proffered evidence that he was a model citizen who dedicated substantial portions of his adult life to public service and generously provided financial support to family members during times of hardship led the judge to find mitigating factors seven and nine. See N.J.S.A. 2C:44-1(b)(7) and (9). In addition, the judge found mitigating factor eight because the offense was out of character and, having already lost his job, Trinidad was unlikely to reoffend under like circumstances. See N.J.S.A. 2C:44-1(b)(8). The judge, however, applied aggravating factor nine after finding there was need to deter other police officers from engaging in similar conduct. See N.J.S.A. 2C:44-1(a)(9). In weighing those factors, the judge held that the mitigating factors were not so "extraordinary" as to merit waiver or reduction of the mandatory minimum prison term and did not overcome the need to deter such conduct by police officers.

We agree. The fact remains that Trinidad brutally assaulted a defenseless person who was not resisting arrest. He then lied to cover up his crimes so he could keep his job and knowingly caused the State to bring unsupported, serious charges against Jeter. His predicament is self-imposed and certainly does not outweigh the general deterrence gained by his

38

imprisonment. He simply has not made the requisite showing for waiver or reduction of his mandatory minimum sentence. Accordingly, we find the judge did not abuse his discretion in sentencing Trinidad.

V.

Trinidad also appeals the trial judge's denial of his motion for judgment of acquittal. Applying the same standard as the judge, we review for whether the State's evidence was sufficient to warrant a conviction. R. 3:18-1. However, giving the State the benefit of "all of the favorable inferences" that we could draw from the evidence, we agree with both the trial judge and Appellate Division that a reasonable jury could find the defendant guilty of each charge. See State v. Reyes, 50 N.J. 454, 458-59 (1967). From our review of the record, we are satisfied that the strength of the State's case leads to no other conclusion.

VI.

For the reasons set forth, the judgment of the Appellate Division is affirmed.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion. JUSTICE ALBIN filed a dissent, in which JUSTICE LaVECCHIA joins.

State of New Jersey,

Plaintiff-Respondent,

v.

Orlando Trinidad,

Defendant-Appellant.

JUSTICE ALBIN, dissenting.

The egregious trial errors that led to the conviction of Officer Orlando Trinidad on charges related to police misconduct were not harmless beyond a reasonable doubt. Those errors denied Trinidad the fundamental right to a fair trial. Because the majority affirms a conviction I believe should be reversed, I respectfully dissent.

The majority admits that the alleged victim's testimony about "notorious episodes of police brutality were highly prejudicial" and "could inflame the passions of the jury, tainting their evaluation of Trinidad." Ante at ___ (slip op. at 27). The majority admits that the referenced "notorious incidents of police brutality could have led the jury, in turn, to liken Trinidad to the officers in those cases" and that "[t]he risk of undue prejudice was simply 'too high.'" Ante at ___ (slip op. at 28) (quoting State v. Cole, 229 N.J. 430, 448 (2017)). Instead of striking the impermissible testimony, the

1

trial court instructed the jury that it could use the damning testimony in its deliberations, thus further heightening the prejudice against Trinidad.

The majority also concedes that the trial court should have stricken Lieutenant Cofone's testimony that Trinidad's actions "appeared to have been criminal." Ante at ___ (slip op. at 23). That improper opinion testimony attesting to Trinidad's guilt invaded the sole province of the jury. It is hard to imagine more prejudicial testimony in the trial of a police officer than an alleged victim's irrelevant and inflammatory references to sensational police brutality cases and a superior officer offering his opinion of the accused's guilt.

When errors prejudice a defendant's right to a fair trial, "our fundamental constitutional concepts dictate" that a new trial should be granted, regardless of "our own views as to whether the evidence established the defendant's guilt." State v. Orecchio, 16 N.J. 125, 129 (1954). Instead of heeding that admonition, the majority has essentially convened as a jury, weighed the evidence, and cast its own verdict -- using the harmless-error doctrine to uphold this tainted verdict. Errors of the magnitude in this case, however, cannot be considered "harmless" unless they are "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967); see also State v. McCloskey, 90 N.J. 18, 32 (1982). Finding that the aggregate errors

2

were harmless beyond a reasonable doubt not only devalues the harmless-error standard in this case, but also lends a precedent to uphold unjust convictions in future cases.

I.

Officer Orlando Trinidad responded to the scene of a roadside stop to assist fellow officers in the arrest of Marcus Jeter who, despite insistent and urgent police demands, refused to exit his vehicle for over four minutes. Eventually, the officers forcefully removed Jeter from his car and arrested him. Based on the apparent conflict between the dashcam videos and the police reports filed by the officers, Trinidad was charged with aggravated assault, falsifying records, and official misconduct. Ultimately, based on its viewing of the dashcam videos, the jury had to decide whether Trinidad engaged in the use of excessive force by purposely, knowingly, or recklessly causing bodily injury to Jeter.

One of the elements of the crimes charged was Trinidad's state of mind. The state of mind of the alleged victim -- Jeter -- was not at issue. Whether Jeter had justifiable reasons for remaining in his car was not relevant to whether Trinidad unlawfully used excessive force after Jeter was removed from the car. Because Jeter's state of mind was not the issue, his testimony concerning well-publicized and sensational cases of police brutality had no

3

"tendency in reason to prove or disprove any fact of consequence to the determination of the action" -- Trinidad's guilt or innocence of the charges. See N.J.R.E. 401 (defining relevant evidence). Even assuming that Jeter's references to sensational cases of police brutality against people of color had some minimal probative value, it was substantially outweighed by the risk of undue prejudice. See N.J.R.E. 403.

Despite the lack of relevance of Jeter's state of mind, the trial court permitted Jeter to testify on four separate occasions about some of the most highly publicized cases of police brutality against people of color in the last thirty years. Jeter repeatedly referenced the notorious cases of Rodney King, Sean Bell, Amadou Diallo, and Oscar Grant -- cases covered widely in the national media.

In the King case, a video revealed a group of police officers striking a seemingly compliant African American man with their nightsticks and kicking him.[1] In the Bell case, police officers shot and killed an unarmed African American man on the morning of his wedding in a hail of fifty bullets.[2] In the

---

[1] Seth Mydans, Tape of Beating by Police Revives Charges of Racism, N.Y. Times (Mar. 7, 1991), https://www.nytimes.com/1991/03/07/us/tape-of-beating-by-police-revives-charges-of-racism.html.

[2] Matt Flegenheimer & Al Baker, Officer in Bell Killing Is Fired; 3 Others to Be Forced Out, N.Y. Times (Mar. 23, 2012), https://www.nytimes.com/2012/03/24/nyregion/in-sean-bell-killing-4-officers-to-be-forced-out.html.

4

Diallo case, four white police officers fired on an African immigrant forty-one times as he reached for his wallet while standing in the vestibule of his apartment building, killing him.[3]  And in the Grant case -- an instance of excessive use of force in a subway station -- the police shot and killed a young, unarmed African American man.[4]  The Grant case was the subject of a feature-length, award-winning biographical drama called Fruitvale Station (Significant Productions 2013).

The references to those sensational police-brutality cases were clearly capable of inflaming the passions of the jury and "tainting [the jury's] evaluation of Trinidad," as even the majority recognizes.  Ante at __ (slip op. at 27).  Indeed, in a trial of a police officer for allegedly assaulting a person of color, no testimony could have been more incendiary.  The only issue in this trial should have been a judgment on Trinidad's individual guilt; the court should not have opened the door to a potential jury referendum on police violence in general.  Trinidad should not have been compared to the police

---

[3]  Jane Fritsch, The Diallo Verdict:  The Overview; 4 Officers in Diallo Shooting Are Acquitted of All Charges, N.Y. Times (Feb. 26, 2000), https://www.nytimes.com/2000/02/26/nyregion/diallo-verdict-overview-4-officers-diallo-shooting-are-acquitted-all-charges.html.

[4]  A.O. Scott, A New Year, and a Last Day Alive, N.Y. Times (July 11, 2013), https://www.nytimes.com/2013/07/12/movies/fruitvale-station-is-based-on-the-story-of-oscar-grant-iii.html.

officers in the King, Bell, Diallo, and Grant cases. Permitting the jury to draw a connection to those past cases of police misconduct created an intolerable risk that the jury condemned Trinidad on the basis of collective guilt.

Even the prosecutor understood "the inflammatory aspect" of Jeter's testimony and likely would have halted the prejudicial references to the emotionally charged cases had the court not offered its erroneous opinion that "there's a question here" about Jeter's state of mind. Instead of striking Jeter's highly prejudicial testimony, the court instructed the jury on the permissible use of the testimony "insofar as . . . you find it relevant to this witness's state of mind." That instruction amplified the prejudice, effectively guiding the jury to misuse evidence that should have been excluded from its deliberations.

Had Jeter been on trial for obstructing the police for disobeying commands to exit his vehicle, the officers could not have offered testimony about tragic cases of police officers shot and killed during motor-vehicle stops. However strong the State's case might be, it is improbable that such testimony could ever be deemed harmless. I can discern no difference in Trinidad's case.

## II.

Further contributing to the unfairness of the proceedings was the testimony of Lieutenant Cofone, who told the jury that, based on his review of the dashcam videos, "the actions of the officers . . . appeared to have been

6

criminal." This Court has repeatedly held that a police-officer witness -- here a superior officer -- may not venture an opinion on a defendant's guilt. See State v. Frisby, 174 N.J. 583, 593-94 (2002). Such a "pronouncement of guilt . . . intrudes on the exclusive domain of the jury as factfinder." See State v. Cain, 224 N.J. 410, 427 (2016). Cofone's testimony is particularly problematic because "[a] jury may be inclined to accord special respect to" the opinion testimony of a police officer. See Neno v. Clinton, 167 N.J. 573, 586 (2001).

Despite defense counsel's failure to object, the trial court had an "independent duty" to give the jury an appropriate charge to disregard the improper testimony. See State v. Scharf, 225 N.J. 547, 580 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). Courts cannot abdicate their duty simply because no objection is made. See id. at 581. Cofone's testimony had the clear capacity to undermine the jury's exclusive role as factfinder and deprive Trinidad of a fair trial. See Frisby, 174 N.J. at 594; see also R. 2:10-2.

### III.

I acknowledge that, without the highly prejudicial testimony that undermined the fairness of the trial, the State presented sufficient evidence for a rational jury to return a verdict of guilty. But the means by which a verdict is returned makes a difference. Fundamental fairness and due process make a

7

difference.  State v. Frost, 158 N.J. 76, 87 (1999) (finding that "[e]ven if the evidence were overwhelming, that could never be a justifiable basis for depriving a defendant of his or her entitlement to a constitutionally guaranteed right to a fair trial").  The views of members of this Court are not material to whether the evidence established Trinidad's guilt.  See Orecchio, 16 N.J. at 129.  The only issue is whether the egregious errors committed in this case, in their aggregate, were harmless beyond a reasonable doubt.  See State v. Weaver, 219 N.J. 131, 162 (2014); see also Orecchio, 16 N.J. at 129.  Errors of constitutional magnitude that "possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless" beyond a reasonable doubt.  Chapman, 386 U.S. at 23-24.

I cannot conceive that the errors so fully described in the majority opinion and this opinion did not "possibly influence[] the jury adversely to" Trinidad, and thus I must conclude that the errors were not harmless beyond a reasonable doubt.  See ibid.  By that standard, Trinidad did not receive a fair trial, and his conviction should be reversed.

Last, I must express a note of caution to all courts about the overuse of the harmless-error doctrine.  Although no trial is perfect and minor errors should not be the cause for overturning an otherwise fair trial, significant errors that undermine the integrity and fairness of the trial process must be

8

addressed by the ultimate remedy -- reversal of the conviction and the grant of a new trial. When flagrant errors that deprive a defendant of his fundamental rights are characterized as harmless, confidence in our criminal justice system is eroded. We depend on prosecutors and trial courts to exercise great care in adhering to basic constitutional precepts and our rules of evidence. But prosecutors and courts must know that when they commit egregious errors that mortally cut into the fair-trial rights of a defendant, there will be real consequences.

Because I believe Trinidad did not receive the fair trial guaranteed to him by our constitution, I respectfully dissent.