**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1114-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

VINCENT RICHARDS,

    Defendant-Appellant.

_____

Argued November 13, 2024 – Decided December 4, 2024

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-08-1327.

Margaret R. McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Margaret R. McLane, of counsel and on the briefs).

Bethany L. Deal, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Bethany L. Deal, of counsel and on the brief).

PER CURIAM

Following denial of his motion to suppress, defendant Vincent Richards ("Defendant") pled guilty to second-degree possession of a controlled dangerous substance ("CDS") with intent to distribute, N.J.S.A. 2C:35-5a(1)/2C:35- 5b(2) and was sentenced below his negotiated plea to a seven-year custodial sentence with no parole ineligibility. He appeals from the denial of his suppression application and sentence and raises the following issues for our consideration:

> POINT I:
>
> THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS BECAUSE THERE WAS NO REASONABLE SUSPICION FOR THE STOP, AND POLICE DID NOT HAVE PROBABLE CAUSE TO SEARCH DEFENDANT'S CAR. ALTERNATIVELY, THE CAR SEARCH WAS ILLEGAL BECAUSE ANY PROBABLE CAUSE DID NOT ARISE FROM UNFORESEEABLE AND SPONTANEOUS CIRCUMSTANCES.
>
> > A. There Was No Reasonable Suspicion to Stop Defendant.
> >
> > B. The Police Did Not Have Probable Cause to Search Defendant's Car.
> >
> > C. Alternatively, Any Probable Cause Did Not Arise From Unforeseeable and Spontaneous Circumstances.
>
> POINT II:
>
> DEFENDANT'S SENTENCE IS EXCESSIVE AND SHOULD BE REMANDED FOR RESENTENCING.

A-1114-23

We reject defendant's arguments regarding the motion to suppress and affirm his conviction and sentence.

I.

The events leading to defendant's indictment were described in detail at a suppression hearing at which Toms River Police Department Patrolman Louis Taranto ("Taranto") and Detective Duncan MacRae ("MacRae"), and defendant testified.

On April 24, 2019, at approximately 6:30 p.m., Taranto, a member of the Toms River Police Department's Special Enforcement Team ("SET"), was conducting plain clothes surveillance in the parking lot of the ShopRite located at 2 Route 37 West. Taranto was conducting surveillance at that location based on his personal experience as a SET member, he knew that this was an area where a high number of narcotics-related transactions occurred. Taranto testified he had engaged in over one hundred surveillance details at the ShopRite parking lot and has participated in dozens of CDS-related arrests there.

During this surveillance, Taranto observed a "newer model Jeep Grand Cherokee parked with a sedan directly to the south of it." Taranto testified he "noticed that there was a black male [later identified as defendant] outside of the sedan speaking to what appeared to be a white female inside." Taranto also

observed "another vehicle parked to the north of [defendant's] vehicle, a Dodge Ram . . . [A]fter . . . a few moments of conversation, I observed the defendant depart his location, walk over and begin talking to the driver of the Dodge Ram." He further testified his suspicions were triggered due to his training and experience that distributors of narcotics will sometimes meet with multiple users in a parking lot to distribute. Taranto also observed that defendant "briefly leaned inside the open passenger side window of the Dodge Ram."

Taranto testified that after this interaction, the Dodge Ram left its parking space and relocated to a remote southern area of the same parking lot that was devoid of any other vehicles. Taranto then observed defendant enter his Jeep, park closer to the ShopRite entrance and enter the store with a female. Taranto stated he maintained surveillance on the Dodge Ram, then decided to drive past it to see if he could observe what the driver was doing. On the first pass-by, Taranto observed the driver "looking down at his lap," to which he testified "through my training and experience, I know that users of narcotics will often examine the narcotics that they just purchased which is what I believed him to be doing at the time." On the second pass-by, Taranto observed the driver "leaned down and then up quickly in a motion that I believed to be indicative of him snorting something."

At that point, Taranto believed a narcotics-related transaction occurred between defendant and the driver of the Dodge Ram.

Taranto then advised the other SET members of his observations and followed the Dodge Ram as it exited the parking lot towards Garden State Parkway northbound. Taranto stated that soon after, the driver of the Dodge Ram, Stephen Lacicero ("Lacicero"), was stopped on the parkway by other SET members along with a marked police car. Taranto testified that he cut through a turnaround on the Parkway in order to circle back to where Lacicero was stopped. Taranto testified the Patrolman told him that Lacicero admitted that he purchased five wax folds of heroin from defendant in the ShopRite parking lot and snorted them while parked in the remote area of the lot.

While Taranto pursued Lacicero, another member of the SET, Detective MacRae, who was conducting general surveillance at a nearby Kohl's parking lot, responded and went to the ShopRite parking lot and waited for defendant to exit the store. MacRae testified that as defendant approached his Jeep, MacRae stopped him and explained to him they were conducting a narcotics-related investigation, then advised defendant of his Miranda[1] rights. MacRae then informed defendant that his "partner saw you meeting with someone in the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

parking lot" and "[they] believe that it was a narcotics-related transaction." MacRae testified he asked defendant if there was anything illegal in his car, to which he responded that there was a small amount of cocaine in the back. MacRae stated he then searched defendant's Jeep and located a black backpack containing cocaine, heroin, oxycodone and digital scales. Defendant was then placed under arrest. MacRae was not aware of Lacicero's confession.

As a result of that search, an Ocean County Grand Jury returned an indictment charging defendant with third-degree Possession of a CDS, N.J.S.A. 2C:35-10a(1) (counts one, three, four, five, and six); second-degree Possession with Intent to Distribute a CDS, N.J.S.A. 2C:35-5a(1)/2C:35-5b(2) (count two); and third-degree Possession with Intent to Distribute a CDS, N.J.S.A. 2C:35-5a(1)/2C:35-5b(3) (count seven).

As noted, defendant filed a motion to suppress the evidence seized from the search of the Jeep. On October 29, 2021, the trial court held a hearing on defendant's motion to suppress. In a written opinion, the trial court denied defendant's motion to suppress and subsequently issued a conforming order.

First, the court found the testimony provided by Taranto to be credible because of its observations of him during his testimony. Moreover, the court found "[i]t was noteworthy that when the Court inquired of Taranto whether he

relayed the admissions attributed to Lacicero to SET—information which, undoubtedly, would have increased the officers' suspicions—Taranto admitted that he did not relay this information."  Additionally, the court found MacRae's testimony credible.

As to defendant, the court did not reach the same conclusion regarding his credibility.  Instead, the court found defendant' testimony deviated sharply from that of the officers' testimony.  Specifically, MacRae had characterized the interaction with defendant as unremarkable and polite, but defendant's recollection of the interaction "can be fairly characterized as hostile."  The court noted defendant's claim that MacRae never Mirandized him and placed him in handcuffs almost immediately after he was stopped, and also claimed he never informed officers that his vehicle contained narcotics.  On the other hand, MacRae testified that defendant said there was a small amount of cocaine in the back, and defendant did admit on direct examination—consistent with MacRae's recollection—that whatever was found in the car belonged to him.  The court found it "anomalous that Defendant would claim ownership of CDS while apparently denying that he informed MacRae of its location before the search of his vehicle."  Moreover, the court found it "[m]ost striking[], Defendant asserts MacRae told him, '[W]e have your buddy Steve Lacicero on the highway . . . we

7

caught him with five bags of heroin and he said he bought them from you.'" Contrary to that statement, the court noted that Taranto and MacRae both stated that Taranto did not relay Lacicero's admissions about the purchase of the CDS to MacRae before defendant's arrest.

Additionally, the court found defendant's explanation of the "transactions" in the parking lot compromised his credibility. With respect to the unidentified woman in the sedan, defendant testified she was a friend, but that he did not know her name. Further, the court noted that defendant stated the reason that he approached her in the parking lot was to show off his new vehicle but that "his friend" never left her own vehicle to check out the new Jeep defendant "was eager to show off." The court also referenced that defendant made a similar claim with respect to Lacicero, who defendant claimed was a "car guy" he wanted to show the new Jeep off to, yet Lacicero also never exited his own vehicle to check out the Jeep. The court in finding defendant's testimony to not be credible stated these encounters were "not merely counterintuitive, but also implausible under the circumstances."

After determining credibility, the court found MacRae had articulable reasonable suspicion of criminal activity to conduct an investigatory stop of defendant based on Taranto's observations of defendant's conduct in the parking

8

lot, and the fact that the surveillance was conducted in an area known to law enforcement for its high volume of narcotics transactions. Second, the court found probable cause developed during the investigatory stop by MacRae, when defendant voluntarily admitted to having drugs in the car. Last, the court found that probable cause was unforeseeable and spontaneous because at the onset Taranto had not been surveilling the ShopRite parking lot looking for defendant, and that once MacRae approached defendant it was only for investigatory reasons. Further, it was not until defendant voluntarily admitted to possession of drugs in the car, which was not a foreseeable or anticipated response to the investigatory stop, that probable cause arose.

After the motion to suppress was denied, a plea hearing was held wherein defendant pleaded guilty to count two of the indictment, second-degree Possession of a CDS with Intent to Distribute. In exchange for his guilty plea, the State agreed to recommend ten years of imprisonment with no period of parole ineligibility, and dismissal of the remaining counts of the indictment at sentencing.

On November 3, 2023, a sentencing hearing was held. As to the aggravating and mitigating factors, the court found aggravating factors six, and nine; and mitigating factors eight and nine. The court found the mitigating

factors to outweigh the aggravating factors. The court then sentenced defendant below the plea agreement to seven years in prison, dismissed the remaining counts of the indictment, and imposed the appropriate fines, fees, and penalties.

II.

Defendant argues the court erred in denying his motion to suppress because: (1) police did not have reasonable suspicion that he had been involved in a narcotics transaction; (2) there was no probable cause that his car contained contraband because the detective's testimony that he spontaneously admitted to possessing cocaine was wholly incredible; and (3) in the alternative, any probable cause that did develop that the car contained contraband was from the SET surveillance and observations of defendant, therefore it was foreseeable and not spontaneous.

A.

Our review of a trial judge's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). In reviewing such an application, we must uphold the judge's factual findings, "so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting Robinson, 200 N.J. at 15). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's]

10

opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (citations omitted) (alteration in original); see also Balducci v. Cige, 240 N.J. 574, 595 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019). We review de novo the judge's pure determinations of law, State v. Mann, 203 N.J. 328, 337 (2010), as well as the application of legal principles to factual findings, State v. Harris, 181 N.J. 391, 416 (2004).

"'The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures.'" State v. Smart, 253 N.J. 156, 164 (quoting State v. Nyema, 249 N.J. 509, 527 (2022)). Warrantless searches are presumptively invalid because they are contrary to the United States and the New Jersey Constitutions, State v. Pineiro, 181 N.J. 13, 19 (2009), and "[t]he warrant requirement . . . may be dispensed with in only a few narrowly circumscribed exceptions." State v. Patino, 83 N.J. 1, 7 (1980).

"To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023)

(quoting State v. Chisum, 236 N.J. 530, 546 (2019)). Each exception to the warrant requirement has its own essential elements that must be satisfied to justify a warrantless search. State v. Johnson, 476 N.J. Super. 1, 20 (App. Div. 2023).

Under federal law, the automobile exception permits the warrantless search of a car if it is "'readily mobile' and the officer has 'probable cause' to believe that the vehicle contains contraband." State v. Witt, 223 N.J. 409, 422 (2015) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). New Jersey law authorizes the warrantless search of a car if the police "have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous." Witt, 223 N.J. at 447 (quoting State v. Alston, 88 N.J. 211, 233 (1981)); see also State v. Courtney, 478 N.J. Super. 81, 93 (2024). Further, that probable cause did not exist "well in advance" of the search. Smart, 253 N.J. at 174. This test represents "a sharp departure from a more narrow construction of the automobile exception previously adopted . . . ." State v. Rodriguez, 459 N.J. Super. 13, 21 (2019).

B.

Defendant contends "the motion court's reliance on the SET members['] testimony that the ShopRite parking lot was a 'high crime area' was insufficient to support reasonable articulable suspicion that defendant was involved in criminal activity." Additionally, defendant argues the observations by Taranto were not enough to create reasonable suspicion that he was engaging in criminal activity. He further avers that Taranto did not recognize him or have prior knowledge that he was involved in criminal activity, nor did Taranto state he observed him exchange any objects for money.

Defendant asserts "where police do not see a hand-to-hand transaction, they still must see something to support a reasonable suspicion that a drug transaction occurred." Moreover, he argues the subsequent observations by Taranto of Lacicero—him driving to a secluded area of the ShopRite parking lot, looking down at his lap and then bending down and back up prior to driving away—did not create reasonable suspicion. Defendant proclaims that on cross-examination, Taranto conceded he did not see what Lacicero was looking at in his lap, and that he admitted Lacicero could have been looking at his phone or wallet.

Next, defendant argues that even if Taranto's observations did create reasonable suspicion, it would only pertain to Lacicero using drugs in his truck

and not that defendant had partaken in any criminal activity. He contends that for a seizure of a person there must be particularized suspicion which "cannot be undercut or avoided" just because "coincidentally there exists probable cause to search or seize another" individual.

Defendant also argues the trial court erred in finding probable cause to search his vehicle because it erred in finding MacRae's testimony credible over his. Here, defendant asserts MacRae's testimony is not credible, because it is "simply implausible" defendant would cooperate and "volunteer 'that he had an amount of cocaine in the back seat of the car,'" after being Mirandized. Defendant argues the trial court erred by finding his testimony was not credible. Specifically, without his alleged statement that there were drugs in the car that belonged to him, there was no probable cause that his car contained contraband. As such, police were not permitted to conduct a search, "let alone a warrantless search" of the car.

In the alternate, defendant argues if probable cause did exist that his car contained contraband, the warrantless search was illegal because it did not comport with our state's automobile exception. He posits the circumstances leading to this warrantless search were not unforeseeable or spontaneous, because Taranto was surveilling the parking lot that was known for a high

14

volume of narcotics transactions. Defendant argues that MacRae's investigatory stop was "wholly connected" to Taranto's prior surveillance and investigation of the high crime area so that the probable cause was not unforeseeable because the SET members believed defendant had just conducted a drug transaction using his car. Additionally, he contends the circumstances were not spontaneous because it developed "over the course of a surveillance operation by multiple officers."

We disagree with defendant's arguments and conclude the court correctly determined police had probable cause to believe evidence of a crime was present in defendant's vehicle which arose spontaneously and unforeseeably, allowing police to conduct a warrantless on-scene search of defendant's vehicle.

Stop of Defendant

To determine whether reasonable suspicion exists, a court must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). This analysis may also consider police officers' "background and training," including their ability to "make inferences from and deductions about the cumulative information available to

them that might well elude an untrained person." Id. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

When considering the officers' testimony, under the totality of the circumstances, there was articulable reasonable suspicion for MacRae to stop defendant in the ShopRite parking lot. Taranto stated he was not there looking for anyone specific, nor did he receive information from a confidential informant that a narcotics transaction would take place that night. As to the location, Taranto averred it was chosen because of the high volume of narcotics transactions; he estimated he had conducted around one hundred surveillances there as a member of the SET, but that not every surveillance had ended in an arrest or observation of drug related activity.

Moreover, Taranto testified that while conducting general surveillance of the ShopRite parking lot he observed defendant's activities with the woman and Lacicero. Taranto noted, based on his training and experience, that narcotics distributors will often meet with multiple persons in parking lots. As such, his suspicions were raised when he saw defendant stop speaking to the woman in the sedan and subsequently walk over and begin to speak to Lacicero, who was in the truck. Taranto testified he then observed defendant lean into Lacicero's truck briefly. After making that observation Taranto maintained surveillance on

A-1114-23

the truck as he drove it to a secluded part of the parking lot. Taranto then drove past the truck twice. Taranto testified he had observed what he believed was Lacicero examining and then using narcotics. Taranto then proceeded to follow the truck, with the intention of having a marked unit make a stop. Taranto relayed what he had just observed, including a description of defendant and his vehicle, so that other members of SET, who were conducting surveillance at nearby parking lots, could locate and make contact with defendant when he exited the store. Under the totality of the circumstances, using his training and experience, Taranto had articulable reasonable suspicion that a narcotics transaction had just taken place. Taranto relayed his observations to the other SET members nearby, one of which was MacRae; this allowed MacRae to act on that information and stop defendant when he exited the store.

Search of Defendant's Car

"In assessing whether probable cause exists, courts 'must look to the totality of the circumstances and view those circumstances from the standpoint of an objectively reasonable police officer.'" State v. Diaz, 470 N.J. Super. 495, 529 (App. Div. 2022) (quoting State v. Gibson, 218 N.J. 277, 293 (2014)). "[C]ourts are to give weight to 'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and

reasonably viewed in light of the officer's expertise.'" State v. Citarella, 154 N.J. 272, 279 (1998) (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)). Probable cause, however, "cannot be based upon a mere hunch." State v. Sansotta, 338 N.J. Super. 486, 491 (App. Div. 2001). Probable cause "requires 'a practical, common[-]sense determination whether, given all of the circumstances, there is a fair probability that contraband or evidence of a crime will be found.'" State v. Myers, 442 N.J. Super. 287, 301 (App. Div. 2015) (quoting State v. Moore, 181 N.J. 40, 46 (2004)).

Defendant's contention that the trial court erred in crediting MacRae's testimony over his is belied by the record. Here, after carefully weighing the conflicting testimony before him, the court determined the officers were "forthright in their answers" and "readily conceded" unfavorable information or when a detail could not be remembered. On the other hand, the court found defendant's testimony was inconsistent and illogical. The court's determinations rested squarely on its ability to observe the witness's demeanor, tone of voice, and physical reactions to questions posed of them. See State v. Sims, 65 N.J. 359, 373 (1974). Because the judge's analysis was based on sufficient credible evidence in the record, it will not be disturbed.

A-1114-23

Here, probable cause arose during MacRae's investigatory stop, allowing him to conduct a search of defendant's Jeep under the automobile exception. MacRae testified, and the court found credible, that he approached defendant when he exited the ShopRite. Further, MacRae testified he clearly had his police badge around his neck, identified himself as a police officer, and explained that he was conducting a narcotics related investigation. Additionally, MacRae stated he advised defendant of his <u>Miranda</u> rights, to which defendant responded that he understood those rights. MacRae testified that he explained to defendant what Taranto had observed, to which defendant then stated he had cocaine in the back seat of his Jeep. The statement made by defendant combined with the totality of Taranto's earlier observations of him, gave MacRae probable cause that defendant had conducted a narcotics transaction and evidence would be found within the Jeep.

<u>Spontaneous and Unforeseeable</u>

Alternatively, defendant argues even if there was probable cause to search his vehicle, it did not develop spontaneously and unforeseeably. He argues under <u>Smart</u> this search was foreseeable because MacRae's surveillance occurred only after Taranto relayed his observations from his surveillance of the parking lot. This reliance is misplaced. In this case, unlike in <u>Smart</u>, Taranto

was conducting a general surveillance of the ShopRite parking lot; MacRae was on duty at the same time conducting general surveillance of the Kohl's parking lot which was located nearby. Moreover, Taranto had no previous interaction with defendant, nor did he know of him when he observed the suspicious activity.

Additionally, the fact that Taranto's general surveillance took place at an area known for a high number of narcotics transactions does not make this stop not spontaneous and foreseeable. Taranto testified that he had conducted "approximately one hundred or more" surveillances of that parking lot, to which "dozens" of arrests had resulted, but also that every surveillance had not resulted in an arrest or observation of drug related activity. (emphasis added). As such, Taranto's observation of defendant' suspicious activities was not foreseeable, it was equally as likely that Taranto would not observe drug activity or make a drug related arrest while conducting general surveillance that night. As testified to by MacRae, it was not until defendant admitted to him that he had a small amount of cocaine in the car that his investigatory stop arose to probable cause that evidence of a narcotics crime would be found in the Jeep. Moreover, it had only been approximately thirty-five minutes from the time Taranto made his initial observations, to the time MacRae then approached defendant for the

20

investigatory stop based on reasonable suspicion. This is far from the facts in Smart, where the Court found the warrantless search to be "deliberate, orchestrated, and wholly connected" to the nearly two months investigation that police had been conducting of the defendant. Smart, 253 N.J. at 172. As stated by the Smart court, "whether the circumstances giving rise to probable cause were unforeseeable and spontaneous is a fact-sensitive inquiry that should be analyzed case by case . . . ." Id. at 173. Under the facts in the present case, probable cause developed spontaneously and unforeseeably.

III.

We next consider defendant's arguments seeking a remand for resentencing. Defendant contends the sentencing court erred in failing to explain its application of aggravating factor nine, N.J.S.A. 2C:44-1a(9) and that his sentence is excessive.

Appellate review of sentencing decisions "is relatively narrow and is generally governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). The reviewing court may not substitute its judgment regarding an appropriate sentence for that of the trial court. State v. Case, 220 N.J. 49, 65 (2014); State v. Lawless, 214 N.J. 594, 606 (2013). The test to be applied is "whether, on the basis of the evidence, no reasonable sentencing court

21

could have imposed the sentence under review." State v. Ghertler, 114 N.J. 383, 388 (1989).  Thus, a sentence should be affirmed unless a reviewing court determines that (1) the sentence violated legislative policies, (2) the aggravating or mitigating factors were not supported by credible evidence, or (3) the sentence, although imposed in accordance with the sentencing guidelines, is "clearly unreasonable so as to shock the judicial conscience."  Roth, 95 N.J. at 364-65, 365-66; see also State v. O'Donnell, 117 N.J. 210, 215-16 (1989) (outlining principles of appellate review of sentencing decisions).

Aggravating factor nine invokes "[t]he need for deterring the defendant and others from violating the law."  N.J.S.A. 2C:44–1(a)(9).  The sentencing court's determination is a "qualitative assessment" of the risk of recidivism, but "also involve[s] determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history."  State v. Thomas, 188 N.J. 137, 153 (2006).  "'Deterrence has been repeatedly identified in all facets of the criminal justice system as one of the most important factors in sentencing,' and 'is the key to the proper understanding of protecting the public.'"  State v. Fuentes, 217 N.J. 57, 78–79 (2014) (quoting State v. Megargel, 143 N.J. 484, 501 (1996)).  "'[D]emands for deterrence are strengthened in direct proportion to the gravity and harmfulness

22

of the offense.'" Ibid. (quoting State in Interest of C.A.H. and B.A.R., 89 N.J. 326, 337 (1982)).

For purposes of N.J.S.A. 2C:44–1(a)(9), deterrence incorporates two "interrelated but distinguishable concepts," the sentence's "general deterrent effect on the public in addition to its personal deterrent effect on the defendant." State v. Jarbath, 114 N.J. 394, 405 (1989) (citing C.A.H., at 334-45). In the absence of a finding of a need for specific deterrence, general deterrence "has relatively insignificant penal value." Ibid. (citing State v. Gardner, 113 N.J. 510, 520 (1989)). In weighing the applicability of aggravating factor nine, the sentencing court accordingly focuses on the need to deter the individual defendant "from violating the law." N.J.S.A. 2C:44–1(a)(9).

Here, the sentencing court acknowledged defendant's nearly four-year period of being crime free, making changes in his life, and sentencing him as he stood before it on that day. However, the court found that aggravating factor nine applied, because "the need for deterring you and others from violating the law" still existed. This factor was amply supported by credible evidence in the record. See Blackmon, 202 N.J. at 296-97.

This was defendant's twelfth indictable conviction. He was extended term eligible and could have received a sentence of up to twenty years. Therefore,

his seven-year sentence, in the middle range for a second-degree crime and below his negotiated ten-year agreement, does not "shock the conscience" and is not excessive.

To the extent we have not specifically addressed any remaining arguments, it is because we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION